## SUPREME COURT.

WILLIAM A. HADDEN, JOHN A. HADDEN and FRANCIS POTT, composing the firm of HADDEN & COMPANY, respondents, agt. JEREMIAH W. DIMICK, appellant.

An agreement in writing was entered into between the parties in this action as follows : " It is hereby agreed between J. W. Dimick and Hadden & Co., that the said J. W. Dimick shall, for the three years next ensuing, unless this agreement shall be dissolved by Hadden & Co., on three months' notice, consign exclusively to the said Hadden & Co. all the blankets of his manufacture to be sold by them, and that the commission to be allowed Hadden & Co. for such sales shall be *seven and one-half per cent*, to cover the guaranty of debt and all charges (including insurance from fire) to which the goods may be subject, after being received in store.
New York June 12, 1861.

(Signed)     J. W. DIMICK. [SEAL.]<br>(Signed)     HADDEN & Co. [SEAL.]

Sealed and delivered in the }
    presence of     }
    (Signed)     WM. G. THOMSON,
                Witness.

*Held*, 1st. That this agreement having been duly acknowledged by one of the plaintiffs' firm and by the defendant to have been properly signed, and being attested by a subscribing witness at their request, was properly admissible in evidence.

*Held*, 2d. That the partners authority to execute the sealed instrument was ratified by the subsequent acts of the plaintiffs under it, even if there was a failure of proof of authority existing at the execution of the paper.

*Held*, 3d. That the agreement was *mutual;* and that it was not in *restraint of trade*.

*Held*, 4th. That the agreement did not permit the defendant to sell blankets of his manufacture, himself, without a *breach* of the agreement.

*Held*, 5th. That all preceding and cotemporaneous agreements were merged into the writing ; and it was therefore right to reject the evidence offered as to a previous parol agreement in addition to the writing itself.

*Held*, 6th. That if the plaintiffs subsequently promised to be the defendant's *sureties* upon a contract to be obtained of the U. S. Government by the defendant, to sell his blankets to the Government, it was no defense to this action to recover the plaintiffs' *commissions* on the sales actually made by the defendant himself subsequently to the Government, by an agreement entered into by the

Hadden agt. Dimick.

defendant with the Government with other sureties than the plaintiffs. They had a right to recede if they had promised. (INGRAHAM, P. J. *dissenting—holding that the plaintiffs' consent to defendant's selling to the Government might be inferred, or at least there was evidence enough to submit to the jury the question of their consent.*)

*New York General Term November,* 1866.

*Before* INGRAHAM, P. J., BARNARD *and* LEONARD, *Justices.*

THIS case involves very important questions of an almost every day commercial character, and which, under the agreement of the parties, consist largely of facts which are brought out by the evidence and the points of the respective counsel. The dissenting opinion of Judge INGRAHAM seems to touch the only doubtful point in the case. The plaintiffs' statement is as follows : On the 12th day of June, 1861, the parties entered into the written agreement, of which the following is a copy :

"AGREEMENT.—It is hereby agreed, between J. W. Dimick and Hadden & Co., that the said J. W. Dimick shall for the three years next ensuing, unless this agreement shall be dissolved by Hadden & Co. on three months' notice, consign exclusively to the said Hadden & Co., all the blankets of his manufacture to be sold by them, and that the commission to be allowed Hadden and Co, for such sales, shall be *seven and one-half per cent,* to cover the guaranty of debts and all charges (including insurance from fire) to which the goods may be subject after being received in store.

New York, June 12, 1861.

(Signed)    J. W. DIMICK. [SEAL.]

(Signed)    HADDEN & Co. [SEAL.]

Sealed and delivered in }
    the presence of   }

(Signed)    WM. G. THOMSON,
                Witness."

It is in the handwriting of a clerk of the plaintiffs, and the signatures were acknowledged by the parties in the presence of the subscribing witness.

The words "including insurance from fire," were interlined by the defendant before the execution of the instrument, over some pencil memorandum. At the foot of the contract

there was a pencil memorandum, a part only of which was legible at the time of the trial. It looked as though there had been four lines; the first two were mostly rubbed out, and were not intelligible; the other two were considerably rubbed out also (but not with india-rubber). The witness Prichard copied it, and his copy is to this effect: " that the goods should be advanced upon by the paper of Hadden & Co. to the extent of one-half of the invoice value." Dimick could not tell what the pencil marks were. Whatever they were, they were not incorporated in the written contract. There is no evidence when they were put there, or that they were on the paper when its execution was acknowledged, and the attention of the subscribing witness was not called to it, if it was there at that time.

Dimick, after the contract was made, applied at different times to Hadden & Co. for advances, to assist him in making new machinery for blankets. They always advanced to him when requested, until February, 1862, when they declined because the blankets would not sell.

For a statement of amount of advances, with the explanation by each party, see folios 118 to 123 and folio 149 of the case.

These advances were all made to enable Dimick to carry out his contract for blankets, by the procuring of machinery for their manufacture. They were purely voluntary on the part of Hadden & Co.

In the absence of an agreement, it is a matter of discretion with consignees whether to make advances or not.

After the execution of the contract, Dimick began to manufacture blankets, and in August, September, October, November and December, 1861, sent them to Hadden & Co. for sale.

In December there was an accumulation of blankets in their hands to the amount of $10,000 to $15,000, which they had not sold and could not sell at any price. Up to December they had sold only a few bales. The whole of these blankets were finally sold, in August, 1862, to the United States, and there was no period prior to this at which the

Hadden agt. Dimick.

blankets would have brought the prices at which they were then sold. Dimick limited the price at which the blankets were to be sold; substantially, this is admitted by Dimick.

Hadden & Co. made strenuous efforts to sell at the prices named, but could not. Dimick says they could have been sold, but that is a mere opinion, and there is no evidence that he ever complained to the plaintiffs of any neglect on their part while the blankets were in their possession, or that he ever claimed to rescind the contract on that ground.

The plaintiffs consulted Dimick's interest in regard to sales. "Nothing was done without consultation with Mr. Dimick;" and he knew the whole amount of blankets on hand unsold, up to the time of the final sale in August, 1862.

The reason why sales could not be effected was, that the Government was then largely importing foreign blankets, which shut out those of domestic manufacture.

In December, 1861, Dimick asked for further advances on these blankets. Plaintiffs had then on hand some $10,000 to $15,000 worth, which they could not sell; as before stated, they declined to make advances on the blankets, on the ground that they could not sell them; but offered to do so on goods that could be sold at auction. To this Dimick, it seems, did not assent, but told them he would have to stop manufacturing, which they said was the best thing he could do, as they did not want the blankets, and he accordingly did stop manufacturing for a time; but they never declined to sell for him, and never told him that he could get somebody else to sell for him.

Accounts were rendered to Dimick by plaintiffs every six months, and he was always in their debt from $2,000 to $3,000.

In August, 1862 (when the balance of blankets on hand was sold by the plaintiffs to the Government as aforesaid), the United Ssates were in the market for the purchase of domestic blankets, and had issued proposals inviting bids.

Dimick went to Haddens' and told them this, and that he intended to put in a bid; he wished them (plaintiffs) to take Government pay, which, at that time, was half money and

half certificates of indebtedness, and pay him as he delivered the goods.

Pott, one of the plaintiffs' firm, said he would sign a bond and deliver the goods to the Government, and take Government pay, and give Dimick the money as he delivered the goods for seven and one-half per cent commissions, if Dimick got the contract.

On the 25th of August, 1862, Dimick put in his first proposal or bid for 20,000 blankets at $7.50 per pair, stating in his proposal that the blankets were sold in this city by Messrs. Hadden & Co., 340 Broadway, and pledging himself to enter into a written contract with the Government with good and approved securities, within ten days after notice that his bid had been accepted.

Subjoined to this proposal was a guaranty signed by John A. Hadden and Francis Pott in their individual names, to the effect that Dimick would comply with the terms of his proposal. This first bid or proposal was thrown out or rejected. Dimick then made a sample blanket and went with Spencer (the plaintiffs' salesman) to the assistant quartermaster, Col. Vinton, who told him he would give him a contract if he would make the blanket a little stronger.

A second sample was also rejected, but a third sample pleased him, and he gave Dimick a contract for 31,000 blankets.

This second bid or proposal, with a similar guaranty (not signed by any one), is set out at length (folios 83–87, inclusive of the case).

Spencer was with Dimick at the office of Col. Vinton when this bid was accepted. Col. Vinton said he would take the contract securities. Spencer told Dimick to send them to Hadden & Co.; he afterwards received a notice, as he says, from H. & Co. that the bonds and contract were ready, and it was necessary for him to go up and sign them. He and Spencer went up again to Vinton's, and took away the contract of Dimick with United States, and two blank security bonds.

This contract with the Government and the bonds are set out at length (folios 89 to 102 inclusive, of the case).

Dimick then went to Hadden & Co., and signed the bonds. Up to this time, Dimick had no negotiation or conversation with Hadden & Co. or either of the members of the firm, in respect to their becoming sureties on any other bond than the first. Nor is there any evidence that Hadden & Co. knew that a second proposal was to be made. Dimick swears that Mr. Pott at this interview—Hadden being, he thinks, in the office at the time—said they would sign the bonds that day, and would send them back to Col. Vinton's office; that he told them he wanted them to sign them immediately, and that they said he need not take any trouble about it; that he must go to the mill, and go on with the blankets as fast as possible.

Mr. Pott expressly contradicts this; he swears that after the first bid was rejected, neither he nor any one of his firm told Dimick that they would become his sureties to the Government on any other contract; that he had but one conversation with Dimick about it, and declined to give security. Again, he swears that Dimick is mistaken about the interview he spoke of; that no interview of that kind took place; that Dimick never came to see them but once (on this subject), and that time they positively refused to become sureties.

And he gives his reasons for refusing. Again he swears, " I said from the very commencement that I would not give security upon that second contract."

In all this he is corroborated by Spencer, who was present at the interview. (See also testimony of Dimick, folios 105 to 110 inclusive, of the case). The names of John A. Hadden and Francis Pott are written in the body of the two surety bonds in question.

By whom this was done is not shown. Spencer thinks it looks like John A. Hadden's, yet he is not familiar with his handwriting, and he says it looks quite as much like the handwriting of two of the entry clerks. Whoever wrote in the names, did it without authority.

Spencer had no authority whatever beyond that of salesman, and could not commit the firm to anything without consulting the firm. When he went to the quartermaster's with Dimick, he went simply as Hadden & Co.'s salesman, and with no other authority, and in that capacity did all he did do in procuring the contract. He knew nothing as to what facilities Dimick had for procuring sureties; he supposed he would get security, but did not know what his resources were; he did not know that Hadden & Co. would refuse to be his guarantors; he did not know anything about it. It is, therefore, not proved that Hadden & Co. ever promised or agreed to become security on the contract which Dimick actually made with the Government; but the very contrary is proved.

Dimick must have procured other sureties.

Under this contract he went on delivering blankets to the Government himself, during October, November and December, 1862, and January and February, 1863, without consigning them to Hadden & Co., and wholly regardless of his contract with them, to the extent (at the time this action was commenced—February, 1863) of 20,584 blankets, at $3.75 a blanket, and received the pay for them himself directly from the Government.

In consequence of this, the plaintiffs wrote to Dimick the two letters set out at folios 115–16–17 of the case, dated October 20 and November 8, 1862.

Dimick had left off all communication with the Haddens since the 6th of October, 1862.

This suit was brought to recover damages for this breach of the contract.

The defense as stated by the defendant was as follows :

*First.* That the contract was void for the following reasons :

I. Want of mutuality.

II. Being in restraint of trade.

III. Being against public policy, as tending to deprive the government of the benefit of competition.

*Second.* That certain words written in pencil at the foot

Hadden agt. Dimick.

of the.ink writing were part of the agreement, with which the plaintiff had not complied.

*Third.* That the written paper contained only part of an entire agreement in parol which embraced terms not fulfilled by the plaintiffs.

*Fourth.* That this written paper was obtained by misrepresentation.

*Fifth.* That the sale to the United States was made with the assent of the plaintiffs, and precluded them from the commission.

*Sixth.* That the plaintiffs refused or neglected to sell blankets which had been consigned, and the defendant was therefore excused from consigning more.

At the close of the testimony, the defendant's counsel asked the court to direct a verdict for the defendant upon the following grounds:

1st. That the written contract was invalid.

2d. That by its terms it did not prevent the defendant from selling himself.

3d. That the fact was undisputed that a sale was made to the United States by the defendant, in his own name, with the consent of the plaintiffs, and such a sale and the delivery consequent thereon, were inconsistent with the consignment of the goods to the plaintiffs.

But the judge refused so to direct the jury, and defendant's counsel excepted.

The defendant's counsel also requested the court to charge the jury:

1st. That if the jury find that the lines at the foot of the agreement made a part of the agreement they must find for the defendant, unless the plaintiffs complied with the terms mentioned in those lines.

2d. That if the jury find that the plaintiffs, after the making of the written agreement, unreasonably refused or neglected to sell the blankets of the defendant which had been consigned to them, upon the best terms that could be obtained, the defendant was excused from consigning to

them any more blankets, and· they should find for the defendant.

3d. That if the jury find that the plaintiffs, after the making of the written agreement, told the defendant that he might cease to manufacture blankets, and they did not want any more of them, the defendant was excused from consigning any more to them, and they should find for the defendant.

4th. ˙That if the jury find that a new agreement was made between the plaintiffs and defendant for the sale of blankets to the United States, and in pursuance of which the defendant made a sale to the United States, the defendant is not liable, upon the written agreement in suit, for not consigning those blankets to the plaintiffs, and the verdict should be for the defendant.

5th. That if the jury find that the blankets in question could not have been sold to the United States, except upon a guaranteed proposal, and the plaintiffs refused to make or unite in such guaranteed proposal, and consented that the defendant should himself make such guaranteed proposal and sell accordingly, they cannot recover in this action.

6th. That even if the plaintiffs did not consent that the defendant should himself make such guaranteed proposal and sell accordingly, yet, if the blankets in question could not have been sold to the United States, except upon a guaranteed proposal, and the plaintiffs refused to render or unite in such guaranteed proposal, they cannot recover in this action.

But the judge refused to charge the jury as so requested by the defendant's counsel, on any of the said points, and the defendant's counsel excepted to such refusal, severally ·as to each of said points.

The action was tried before Judge ALLEN, November 18, 1863, and the jury, directed by him, to render a verdict for the plaintiffs for $4,183.30, instructing them that there was nothing in the case for them to pass upon.

A motion was made on the judge's minutes for a new trial, and denied.

The appeal is from the order denying this motion, the

judge having at the time, directed judgment to be suspended until the hearing upon the case and exceptions at the general term.

JOHN H. PLATT *and* JOHN SLOSSON, *counsel for plaintiffs.*

*First.* There is no disputed question of fact which could properly have been left to the jury. The only fact about which there is any dispute is the alleged promise of plaintiffs to become security on the defendant's bonds, to the contract, actually made by him with the United States government, and on that subject the testimony of Dimick (the only witness in that behalf for plaintiffs) is so overborne by that of Pott and Spencer, that no verdict which should find such a promise could stand.

Besides whether the plaintiffs agreed to become security or not, is, on the undisputed facts of the case, wholly immarial, as will be hereafter shown.

*Second.* If the contract between these parties was a valid and entire contract, and had not been abrogated or rescinded, the delivery of the blankets by the defendant directly to the United States, and not through Hadden & Co., and receiving payment therefor directly from the Government, was a palpable violation of it on his part, and for which the damages claimed in this action are justly recoverable.

*Third.* The contract was a valid contract between the parties.

It was contended by defendant's counsel on the trial, and the question arises in his exceptions, that it was invalid.

1st. For want of mutuality.

2d. As being in restraint of trade.

3d. As against public policy, in hindering the Government, then at war, in getting blankets for the supply of the army.

Of each of these objections in their order.

I. Was the contract void for want of mutuality?

It was contended on the trial that it was not mutual, because there was no agreement on the part of the plaintiffs to receive the goods or to follow plaintiffs' instructions.

This is not so. The contract commences: " It is hereby agreed between J. W. Dimick and Hadden & Co."

What follows, therefore, is to be referred to an agreement between the parties. Dimick on his part agrees to consign the blankets of his own manufacture for three years to Hadden & Co., so that he is bound, and they are to be so consigned, " to be sold by them " (Hadden & Co.); therefore, all goods consigned are by Hadden & Co. agreed to be received and sold. Dimick agrees to consign, and Haddens agree that, he shall consign, and this for the purpose of being sold. Haddens therefore agree, when he, Dimick consigns, to receive and sell. It seems absurd to give any other interpretation to this contract. Dimick may possibly not be bound to manufacture blankets, but, if he does, he cannot sell them except through Hadden & Co. ; and if he consigns them to Hadden & Co. for sale, they must be received by them " to be sold;" and if they do not sell, he has a clear remedy as for breach of an agreement. Under this agreement, every consignment imposes the duty of receiving and selling. Then there is a consideration to uphold Haddens' agreement, and the instrument is under seal. It was objected on the trial that the proof of the execution of the agreement by the defendants was not sufficient, it having been acknowledged by one only of the partners of plaintiffs' firm, and that therefore the firm was not bound by this contract (see exception at fol. 58). It is an answer to this that a parol authority from one partner to another to seal for him is sufficient, and that this authority may be inferred from the partnership itself and the subsequent recognition of the contract by the other partners (the proof in which respect is full in this case). Nor is it necessary that all the partners should be present. ( *Gram* agt. *Seton*, 1 *Hall*, 262 ; *Renwick* agt. *McAllister*, 5 *N. Y. Leg. Observer*, 16 ; *Worrall* agt. *Munn*, 1 *Seld. p.* 240 ; *Smith* agt. *Kerr*, 3 *Coms.* 144 ; *Skinner* agt. *Dayton*, 19 *J. R.* 513 ; *Cady* agt. *Shepherd*, 11 *Pickg.* 400.)

Besides, both parties having acted under the contract, it is not in Dimick's mouth to make this objection, and he is moreover estopped by being present and acquiescing in the.

acknowledgement of the firm signature by Hadden. (*Fish-mongers' Co.* agt. *Robertson*, 5 *M. & Gr.* 131; 1 *Pars. Con.* 373, *&c. and notes; L'Amoreux* agt. *Gould*, 3 *Seld.* 349.)

And, it may be here remarked, this circumstance of performance takes the case wholly out of the application of *Dorsey* agt. *Packwood* (12 *How. U. S. R.*), relied upon by the other side, even if that case ever had or could have any application or analogy to the present, which it has not. It is wholly dissimilar from the one at bar.

II. This is not an agreement in restraint of trade.

Contracts in restraint of trade generally are void; but those limited as to time, or place, or persons are valid. (*Palmer* agt. *Stebbins*, 3 *Pick.* 188; *Alger* agt. *Thacher*, 19 *Pick.* 51, *and see authorities cited in a learned note*, 2 *Pars. Con.* 254; *Dunlop* agt. *Gregory*, 6 *Seld.* 241; *Van Marter* agt. *Babcock*, 23 *Barb.* 633.)

This contract is reasonable, and the restraint (if it can be called such) is partial, and it is upon an adequate consideration. (*Dunlop* agt. *Gregory, above; Holbrook* agt. *Waters*, 9 *How. Pr.* 335.)

But, in truth, there is no restraint of trade about it. On the contrary, it is a contract inducing a more vigorous exercise of his trade by the defendant. The public cannot suffer, but would rather gain by the execution of the contract. It calls for a continued manufacture by defendant. The contract, in truth, amounts to nothing more than an agreement to employ the plaintiffs, for a limited period, exclusively as his agents to effect sales, on a consideration sufficient to induce the defendant to give the employment.

III. The objection that the contract is against public policy, as tending to hinder the Government in procuring blankets in time of war, does not require much comment. There being no restraint on the manufacture of blankets by Dimick, it is difficult to see how a sale of the blankets through the Haddens, could operate to the injury of the Government, who were at liberty to purchase of the latter as freely as any private person in the land. Such a doctrine would cut up, root and branch, all the thousand relations of consignor and

consignee in respect to goods of which the Government might have need.

*Fourth.* The contract is entire. It is on its face complete, and expressed the will of the parties, and nothing appears to be omitted. The fact that Dimick inserted the words " *including insurance from fire* " in his own hand into the contract before signing it, should be conclusive that the agreement expresses all that the parties intended to express. It is in evidence also, that when the execution was acknowledged by both parties before the subscribing witness, not a word was said about any omission in the contract. Did Mr. Dimick say anything ?" " Not a word."

It is necessary here to consider an offer that was made on the trial to interpolate something else into the contract. The answer sets up in substance that it was part of the agreement that the plaintiffs should make advances on goods (it does not say blankets), and that the written contract expresses only part of the agreement, and was obtained from defendant by the plaintiffs representing to him that they wanted it only for a particular purpose, viz., to show it to customers, etc., and was not intended by him, nor as he believes, intended by the plaintiffs as anything more than a partial statement of the existing agreement between them. This is positively denied by the reply, and the written paper is alleged to contain the whole agreement, both pleadings being under oath. On the trial, defendant's counsel offered to prove " that the previous parol agreement was made as stated in the answer, of which the written paper shows only part." The evidence was excluded, and the defendant excepted. His counsel also at the same time offered to prove ." that this agreement was obtained from defendant by the misrepresentations, and under the circumstances stated in the answer." This was excluded and an exception taken.

Both these rulings were correct.

I. The rule is inflexible that where the written instrument imports on its face a complete expression of what the parties agreed upon, parol evidence is not admissible to add to or vary it. The offer seeks to incorporate a new and indepen-

dent provision into an existing executed written instrument, complete in itself and as an additional, substantial original, stipulation of the contract itself.

This has never been allowed. (*See Cowen and Hill's notes*, 984, 3d vol. p. 1466, 1470, etc. in which the authorities are reviewed; *Durgin* agt. *Ireland*, 4 *Kern*. 322; *Renard* agt. *Sampson*, 2 *Kern*. 561.)

Fraud or mistake are not pretended.

II. Even if the contract had contained an agreement to make advances, there was no breach of it, for the evidence is full that large advances were made by plaintiffs to enable the defendant to complete his machinery. Pott swears they always advanced when asked to do so, until February, 1862, when finding the blankets would not sell, he expressed an unwillingness to advance on the blankets, but even then they lent him their note for $5,000 on other security. Dimick admits that they were willing to make advances upon other goods. Now the answer does not pretend that this parol agreement was that advances were to be made on the blankets, but " by consignment or deposit of goods," so that if the parol agreement had been proved, it could not have availed defendant.

III. In this connection the defendant proved that at the foot of the written contract were four pencil lines, the two first illegible, but the last two with a little pains might be read to say " that the goods should be advanced upon by the paper of H. & Co. to the extent of one-half the invoice value."

The handwriting was not recognized, and Dimick swears he could not read the pencil marks, which is very strange, if he had ever put so important a memorandum there, or knew of one being there. The defendant's counsel asked the judge to charge the jury that if they found those lines made part of the agreement, they should find for the defendant unless the plaintiffs complied with the terms mentioned in the lines.

This the judge declined to do, and properly. It would have violated the rule of evidence above stated, and the evi-

dence was too vague and unsatisfactory; and besides, two of the four lines were not proved at all. Nor was there any evidence that the lines were on the paper at the time it was executed.

IV. The parties acted under the .agreement as it stands, without notice or complaint by either of the omission of so important a particular.

V. In respect to the second offer, it is enough to say that the answer does not set up any "misrepresentations." There is no allegation of fraud, or even of mistake. The offer was purely gratuitous, and unjustified by anything contained in the answer.

*Fifth.* The contract was never abrogated or rescinded.

This involves the propriety of the refusal of the judge to charge the fourth, fifth and sixth requests of defendant's counsel.

The fourth request assumes that there was evidence of a "new agreement" between the parties by which Dimick was to be at liberty to sell directly to the government, and not through Hadden & Co.

There is not a particle of evidence to warrant such an assumption, or on which a verdict in favor of it could be sustained (*See statement of facts*).

Indeed, in his first proposal to the government, Dimick says the blankets are "sold in this city by Hadden & Co., 340 Broadway."

This conclusively shows that in negotiating a sale to the Government, Dimick had no idea of departing from his contract with the Haddens, or of making any new agreement with them.

The plaintiffs' firm agreed to go security on the first proposal, if the contract had been awarded, and two of them signed the guaranty attached to that proposal. But that proposal was rejected, and a new proposal for a larger amount of blankets made. In respect to this, the plaintiffs absolutely declined to become security. They had not been consulted in respect to it. The whole negotiation was between Dimick, Spencer and the quartermaster. Spencer was not

a partner, and had no authority to bind the firm. In this negotiation he acted merely as the plaintiffs' salesman, the same as he would have done had he been negotiating with an individual. The very fact that Dimick availed himself of Spencer's services, shows that he expected that the delivery was to be through Hadden & Co. It was for their mutual interest that a good customer should be procured. In fact the United States were the only customers they had yet found, for it was the Government who bought the large stock which had laid in their hands unsaleable up to August, 1862. That sale was expressly ratified by Dimick. The first that connects the plaintiffs with the second proposal by Dimick to the Government, and which resulted in a contract, was his asking them to become security. At this time the contract had actually been made with the Government. They declined at once to become such security. There was but one conversation on the subject. Dimick swears that Pott, Hadden being (he thinks) in the office (he does not say in his presence or within hearing), promised to sign the bonds. Pott swears Dimick is mistaken, and in this he is corroborated by Spencer, who was present.

The fact that they agreed to be security in the first proposal did not obligate them to become security in a second and much larger proposal, and about which they were not consulted. It was wholly optional with the plaintiffs whether they would sign the bonds or not. The evidence, therefore, wholly fails to support the fourth request to charge.

As to the fifth and sixth requests to charge, it is impossible to see on what ground they can be sustained.

There is no evidence whatever that the plaintiffs consented that the defendant should make a guaranteed proposal and sell accordingly (as it is expressed in the fifth request); that is, sell himself directly to the Government, and not through their intervention. The request treats this, and correctly, as a question of fact for the jury; as a question of fact, there was nothing to warrant its being sent to the jury. It would have been with the jury wholly a matter of speculation,

without evidence of such a consent to guide them. Indeed, all the evidence is the other way.

As to the sixth request, the idea that as the blankets could not be sold without a guaranteed proposal, the refusal of the plaintiffs to become security, put an end, as matter of law, to the contract, is wholly unsupported in any principle known to the law.

Dimick was under no obligation to make this contract with the Government; having made it, he took the risk of getting security. The Haddens may be admitted to have acquiesced in the contract, but that imposed no obligation on them to give security. Their own contract did not provide that they should take any such risks as those, which signing these bonds would have imposed. They were to guarantee debts, but not the delivery of 30,000 blankets of a certain quality.

It is submitted that there was no rescission of this contract, in fact or in law.

There was certainly none in fact. There is not a particle of evidence to show that the Haddens ever assented to an abandonment of it, but just the reverse (see letters, folio 115, etc). This subject has been already sufficiently discussed; nor can a waiver or rescission be implied from any inconsistency between the agreement made between Dimick and the United States, and his contract with the Haddens, assuming that the latter assented to that agreement. There is no other ground than inconsistency between the two contracts, in which it can be pretended in this case that the law could imply or presume a waiver or rescission of the contract between these parties.

It is true the contract was signed by Dimick, and he became personally responsible to the Government that the blankets should be " manufactured and delivered ;" but such delivery and the payment on delivery could as well be done through Haddens as by himself in person. There was nothing in his contract with the Government which required or rendered necessary a delivery by himself personally. It was perfectly immaterial to the Government, under this con-

tract, who made the delivery, or to whom payment was made, provided it was on Dimick's account. If the Haddens, without Dimick's intervention, had originated this negotiation with the Government and got the contract for Dimick, and he had signed it just as he did, it wouldn't be pretended that in so doing they were acting as mere volunteers, and intended to abandon their contract with him, or that there was any inconsistency between their contract and the contract with the Government. They would have been only carrying out their own contract with Dimick by effecting a sale. It is true the character of the purchaser was such as to render a written contract with security necessary, but that would create no inconsistency between the two contracts in anything that related to their mutual obligations to each other, or in any other respect. Neither could Dimick say to the Haddens that they were bound to give security, because they had found the purchaser; and if he procured the security himself, there was nothing in that from which any presumption could arise or inference be drawn that the parties had mutually assented that their contract should be abrogated. This the parties must do, either in fact or by implication of law, to constitute a rescission. Neither can it be said that the promise of plaintiffs to become security on the first proposal enures to the second. That proposal was rejected, and Dimick was in no worse position than if it had never been made. After the rejection of the first proposal, the parties stood precisely as they did before it was made. The contract that was subsequently made by Dimick with the Government must be treated as though the first proposal had never been made. Where either party intends or wishes to rescind, on the ground of any default in the other party, he is bound to give prompt notice of his intention. If Dimick puts his refusal to abide by his contract on the ground of Haddens' refusal to become security on the second proposal, then he should have proved that he promptly notified them of his intention so to do, of which he has not given a particle of evidence.

Again, neither party can rescind unless the other can be

restored to the condition in which he was before the con-tract was made, which Haddens could not have been, if it were true that Dimick was always in their debt from $2,000 to $3,000, as sworn by them.

It must be borne in mind that the defendant does not claim that he had a right to abandon his contract on the ground of any failure on the part of Haddens to perform any stipulation contained in it, but on the ground that they failed to carry out a parol promise to become security, which was wholly outside their contract with him.

This, if ever made (which we have already discussed), was a mere subsequent parol executory promise, which cannot abrogate a contract by speciality. (*Eddy* agt. *Graves*, 23 *Wend.* 82; *Nelson* agt. *Sharp*, 4 *Hill*, 584.)

There is no light in which this case can be viewed in which a case of rescission or abrogation, within the meaning of the law, of this sealed contract between the parties is made out. The case shows a willful abandonment by Dimick (suggested by anger or cupidity) of his contract with plaintiffs, without their consent and their protestation, and without any notice by him of an intention to rescind, or any fault found by him with the plaintiffs of any violation of the contract on their part. (2 *Pars. Con.* 192–2; *Hunt* agt. *Silk*, 5 *East.* 449; *Tartin* agt. *McCormick*, 5 *Sandf. S. C.* 366; *Lattimore* agt. *Harsen*, 14 *J. R.* 330; *Dearborn* agt. *Cross*, 7 *Cowen*, 48; *Dubois* agt. *Del. Canal Co.* 4 *Wend.* 285.)

*Fifth.* It remains to consider the other exceptions in the case.

In respect to the second and third requests to charge, it is sufficient to say:

As to the second, there was no evidence to warrant it, but, on the contrary, the evidence was overwhelmingly the other way. The evidence is clear that there was a limit fixed by Dimick to the price, and that the plaintiffs made strenuous exertions to sell, but without success, until they found the Government in the market. (*See statement of facts.*)

As to the third request, it gives to the testimony on which it is founded a wholly different meaning from what

the evidence warrants (see evidence at folios 68, 69). Dimick, taking his own statements, wanted more advances, and he claimed that the plaintiffs were bound to make them on blankets, alleging that this was according to their agreement (of which, as already shown, there is no evidence whatever). Their answer (assuming Dimick's statement of it to be literally true) was this: "They said they could not sell the blankets, and the best thing I could do was to stop manufacturing—they did not want them." They offered to make advances on other goods, but defendant refused this, and said if they did not advance on blankets he would have to stop manufacturing.

It is perfectly evident that the plaintiffs, when they said " they didn't want the blankets," referred only to the security of blankets for advances.

This conversation occurred in December, 1861, and yet in August, 1862, we find Dimick again acting under his contract with the plaintiffs, and without ever having notified them of any intention to abandon the contract by reason of this refusal, which he was bound promptly to do if he had such intention. This was a waiver of any right to rescind. (*Lawrence* agt. *Dale*, 3 *J. Ch. R.* 23 ; *affirmed*, 17 *J. R.* 437.)

*Sixth.* The only remaining exceptions to be noticed are in respect to the question objected to and ruled out at folio 112 ; it is enough to say that it is wholly immaterial and irrelevant in any aspect of the case, and as the question speaks only of a refusal to carry out a "negotiation," and not a promise, it becomes of no significance whatever. The exception at folio 149 was to the overruling of defendant's objection to the question put by plaintiffs' counsel to the witness Pott, as to what advances their firm had made to Dimick. Now Dimick had himself already sworn on his direct examination all about these advances.

The exception at folio 162 is palpably without foundation.

The exception at folio 206, now referred to, is to the refusal of the court to direct a verdict for the defendant, on the second of the three grounds there stated, to wit: that the contract " by its terms does not prevent the defendant

from selling himself." (The other two grounds there stated have been discussed under previous heads.)

This second proposition is based on the idea that the contract provides only for a consignment of the blankets to plaintiffs, and does not interfere with the right of the defendant to sell himself, to which it is enough to reply, that as all the blankets of his manufacture were to be consigned to the plaintiffs, and all were to be consigned to be sold, it is a little difficult to see how the contract allows Dimick to sell all or any portion of them himself.

*Seventh.* This disposes of all the exceptions taken by defendant's counsel on the trial or presented by the case.

Judgment should be entered for plaintiffs.

EMERSON & PRICHARD *and*
D. DUDLEY FIELD, *counsel for defendant.*

*First.* As the court directed a verdict for the plaintiffs, it is only necessary upon this appeal to show that there was evidence from which the jury might have found a verdict for the defendant. There was the following among other evidence:

The defendant testified (folio 67) that there was "such a change" that the plaintiffs "declined to sell blankets on time, and would only sell them for cash." They would not take the cash. They did not "know one day what another might bring forth." * * * * "They said they did not wish to go on and advance anything upon them; they could not sell them." * * * * "I wanted to make arrangements to make a contract with the Government for a lot of blankets. I told them that the blankets they had on hand for the last year ought to be sold, and, unless they exerted themselves to sell them, I would take them myself and sell them; that they could not lie any longer on hand." "I wanted the proceeds of these blankets to try and start my looms again, and get a contract of the Government. Mr. Pott told me he would send Mr. Spencer up and see if they could sell the blankets to Col. Vinton. I understood after-

wards that they had effected that sale of the blankets, which would be about $15,000, as they told me; and then I told them I would put in a bid for a contract with the Government. I wanted them to take the Government pay, which at that time was half money and half certificates of indebtedness, and pay me as I delivered the goods, to enable me to buy my stock for cash. I would pay them some five per cent commission. Mr. Pott said that was not enough; that if they took the certificates, they would likely lose one per cent, or there would be some discount if they carried them that would give only six per cent. Money was worth more than that. He said he would sign a bond and deliver the goods to the Government, and take Government pay, and give me the money as I delivered the goods, for seven and a half per cent, provided I got the contract. I told them I would look around the market, and see the highest I would have to pay for wool, and make an estimate what I would bid at. The time was short; the bids would have to go in by the 25th August. I went the morning of the 25th August and filled out a proposition, which I signed and they signed.

"Q. Where is that paper?

"A. I believe you have it."

These papers were a proposal by the defendant to the United States to sell twenty thousand army blankets, and two of the plaintiffs signed an agreement, that if the proposal was accepted, the defendant would execute the contract with sufficient sureties. The proposal thus made was not accepted. The defendant then went to the United States Quartermaster again, who finally gave him a contract for thirty thousand. The defendant signed the contract. Bonds were made out for the plaintiffs to sign. Though they had promised to do so, they refused. The defendant says: "I went from Spencer's into Haddens' office, and found Mr. Pott there, the partner; asked him whether they had not signed the bonds? He said, Government securities had gone down to ninety-seven; they thought the matter over, and they were afraid they would be great losers by it; that they might pay me on delivering the goods, and take

Government pay, and not be able to get more than ninety cents on the dollar perhaps ; that perhaps they would not pay promptly. I suppose I staid there in the office from three-quarters of an hour to an hour talking with them. I told them it was too late. I had signed the contract, and that I had purchased stock to the amount of $60,000, which I had to pay for in cash, in sixty or ninety days ; that I had depended on them for the money to pay it. He said they had made up their minds that they would not sign the bond to carry out the agreement; that I might meet other parties, who would carry it out the best way I could. I reasoned with them as regards the signing of the bonds ; I told them that in case I failed to deliver the goods to the Government, the Government might come into the market, and they would hold me responsible for the difference between what they would have to pay, and what I had agreed to deliver them at. They said the Government securities were going down seven and a half per cent; they would get nothing of it. I told them if Mr. Hadden was there he would do it. They said Mr. Hadden was on the way home, and if I would wait they would see what he would do about it. I told them I could not wait. Finally I asked them if I should wait until Mr. Hadden arrived if they would sign the bonds and carry out the contract. They said no, they would not guarantee anything. I might put the matter before Mr. Hadden and he might do as he pleased. After talking with Mr. Pott for three-quarters of an hour, or an hour, finally Mr. Pott made this suggestion : if I would indemnify them against losses, they would carry it out.

"Q. What do you mean by indemnifying them against loss ?

"A. By giving security upon my property, then they would carry out their agreement. I told them I could not do that, and got up and left the office. Prior to this I wanted them to go up to Colonel Vinton's with me, and see about the price. Mr. Spencer said he had been there once, and would not go there again. I wanted him to go and confirm my statement, that the price was to be seventy-five cents. I

wanted Mr. Pott to go to see if they would lower the amount of the bonds. He declined to go ; they would do nothing ; they had become absolutely panic stricken."

The defendant then got other sureties and carried out his contract. If these statements were true the plaintiffs most surely are not entitled to seven and a half per cent for selling and guaranteeing the sale.

Mr. Pott, one of the plaintiffs, admits that they refused to sign the guaranty. He says : " Mr. Dimick never came to see us but once, and that last time we positively refused. Dimick then brought the contract to me upon that morning, and I refused to sign it because we were not willing to give security to the amount of $90,000. I was not satisfied that he could make the blankets, and I did not think we were obliged to do it by our contract. During Mr. Hadden's absence, I did not like to go security for Mr. Dimick to that amount, and positively declined, and requested Mr. Dimick to give collateral security to cover us against any loss, and also to wait until Mr. Hadden came home, as we expected him that week, within two or three days. I did not think I had authority to go to that extent, knowing he had had so much difficulty to produce blankets that would be satisfactory to the Government. I stated that as a reason to him."

*Second.* The written contract should not have been admitted in evidence. It was void for want of mutuality.

1. The signing of a firm name, only one partner being present, is no sufficient execution of a sealed instrument.

No counterpart of it was ever delivered to defendant.

2. Even if duly executed there is no mutuality.

Plaintiffs agreed to nothing—not even to receive a single blanket.

They only agreed to receive a compensation fixed at the very highest rate of the market for similar services, with the addition of advances.

The paper contained nothing for defendant's benefit.

Plaintiffs were not even bound to obey defendant's instructions as to mode of selling, price, &c. (*See Dorsey* agt. *Packwood,* 12 *How. U. S. R.* 126.)

*Third.* The court erred in excluding evidence that there was a previous verbal agreement between the parties under which they had begun to act, only a part of which was contained in the written paper.

That part of the agreement which related to advances was left wholly out of the paper.

Evidence of the verbal agreement relating to that subject ought therefore to have been admitted.

The general rule that "parol contemporaneous evidence is inadmissible to contradict or vary the terms of a valid written instrument" does not apply in cases where the original contract was verbal and entire, and a part only of it was reduced to writing. (1 *Greenleaf on Ev.* § 284 *a.*)

*Fourth.* The court erred in excluding evidence that this paper was obtained from defendant by representations on the part of plaintiffs, that it was wanted only for a special purpose—that it was obtained in the manner and under the circumstances stated in the answer.

*Fifth.* The written contract by its terms did not prevent the defendant himself from selling his own goods.

The true construction of it is that the defendant should not consign his goods to any other house—that the plaintiffs should be his exclusive consignees.

*Sixth.* If, however, the construction claimed by the plaintiffs should be adopted by the court, namely, that the defendant is prohibited by the contract from selling his blankets or disposing of them to the plaintiffs, then the contract is void as being against public policy and in restraint of trade. (*Chappel* agt *Brockway*, 21 *Wend.* 157 ; *Lawrence* agt. *Kidder*, 10 *Barb.* 641 ; *Dunlop* agt. *Gregory*, 6 *Seld.* 241.)

In *Van Marter* agt. *Babcock* (23 *Barb.* 633), the contract was sustained on the ground that the restraint was only local.

The principle should be enforced with special stringency against contracts made during a time of war restraining trade in an article of prime necessity to the army.

If such contracts were made to any extent and upheld by

the courts, the Government might be seriously embarrased in procuring supplies.

In *Lawrence* agt. *Kidder,* above cited, the court says :

" The law will tolerate no contract which on its face goes to prevent an individual for any time, however short, from rendering his services to the public in any employment which he may choose; nor one which deprives any section of the country, however small, of the chances that the obligor may furnish to it the accommodation arising from the prosecution of a particular trade, unless it appear that the other party himself intends to and can supply such accommodation."

It is pretty clearly shown in this case that Hadden & Co. did not intend to supply blankets to the Government of the United States.

*Seventh.* The court erred in refusing to charge, that if the jury find that the plaintiffs, after the making of the written agreement, unreasonably refused or neglected to sell the blankets of the defendant which had been consigned to them upon the best terms that could be obtained, defendant was excused from consigning to them any more blankets, and they should find for defendant.

*Eighth.* The court erred in refusing to charge, that if the jury find that the plaintiffs, after the making of the written agreement, told the defendant that he might cease to manufacture blankets and that they did not want any more of them, the defendant was excused from consigning any more to them, and they should find for the defendant.

An abandonment of a sealed agreement may be shown by parol or by mere acts or omissions of the parties.

In *Dorsey* agt. *Packwood* (12 *How. U. S. R.* 126), a release not under seal nor given for any consideration, was held to be competent evidence, going to show a voluntary abandonment of an agreement.

In this case we have the evidence of a mutual consent so to abandon, followed by the fact that defendant stopped his work in or before January, 1862, and did not make one

blanket from that time until after his contract with the United States in October following.

It was a question for the jury whether such abandonment actually took place.

*Ninth.* The court erred in refusing to charge, that if the jury find that a new agreement was made between plaintiffs and defendant for the sale of blankets to the United States, in pursuance of which defendant made a sale to the United States, defendant is not liable upon the written agreement in suit for not consigning those blankets to plaintiffs, and the verdict should be for defendant.

The facts leading to and attending the new agreement must be looked at.

Whether with or without the advice or consent of plaintiffs, defendant's mills had been absolutely stopped in January, 1862, and not one blanket had been manufactured by him from that time—whatever may be the legal bearing of this fact, it practically annulled the contract of 1861. It is not questioned that defendant had a perfect right so to annul it, in any view of the case—and it would have lain dead forever and profitless to plaintiffs unless some new arrangement should be made.

In August, 1862, an opportunity offered to plaintiffs of inducing defendant to resume the manufacture and causing him to place himself in a position where he could not again, as before, discontinue at his option—this was by getting him committed in a contract with the Government of the United States, and for this purpose they opened new negotiations, the result of which was in evidence before the jury.

In brief, plaintiffs referred defendant to the head of their blanket department, Mr. Spencer, to carry out the plan; Spencer accompanied defendant to quartermaster's office and wrote out a bid; it was informal and rejected. After a few days Spencer and defendant prepared an amended bid, it was still insufficient; again, after a few days more they prepared a third bid. It was in Spencer's handwriting like the others.

The plaintiffs attempt to make a distinction between the

original bid and the amended bids, and say that their agreement to give bonds, applied only to the original bid, and that they took care to have that made in such form that the Government could not accept it.

But the three successive bids were all made in answer to the one advertisement of the quartermaster. Plaintiffs never notified defendant that they would not sign, nor that Spencer's authority to assist him about getting a contract, was revoked.

They let defendant and Spencer go on upon the supposition that they would sign the bond until they had got defendant absolutely committed by the signing and delivery of a contract with the Government, and then when he could not draw back, they did.

1. The three bids were, in fact, but one bidding, the second and third being amendments and substitutes for the first.

2. Spencer was plaintiffs' agent throughout the transaction.

If there can be any doubt of this it should have been submitted to the jury.

3. By the consent of plaintiffs, never revoked, and under the guidance of plaintiffs' agent, defendant partially executed the new executory agreement, and in so doing of necessity bound himself to the United States.

4. This partial execution was irrevocable. Nothing that defendant or plaintiffs could possibly do could restore the defendant to the situation he occupied before.

He was now bound to make blankets ; before, he was not under the slightest obligation to make one.

5. When plaintiffs had got defendant so bound, and not before, they broke from the new agreement.

6. Plaintiffs can have no claim against defendant for agreed commissions on defendant's sale to the United States, because these blankets were never consigned to plaintiffs, and the agreement sued on applies only to consigned goods.

The items covered by it of guaranty, commission, storage

and insurance never existed in the case of the goods sold to the United States.

7. Plaintiffs can have no claim against defendant either in the form of commission or of damages for failure to consign these goods, because defendant acted with the consent and co-operation of plaintiffs in putting it out of his own power to consign them to plaintiffs.

He who assists in preventing a thing being done cannot avail himself of the non-performance he has himself occasioned.

8. If plaintiffs have any claim against defendant in connection with the transactions stated in the complaint, it can only be for breach of the new agreement under which plaintiffs were to be allowed to receive the contract price from the Government. The merits of that claim are not involved in this action.

*Tenth.* The court erred in refusing to charge, that if the jury find that the blankets in question could not have been sold to the United States except upon a guaranteed proposal, and plaintiffs refused to make or unite in such guaranteed proposal, and consented that the defendant should himself make such guaranteed proposal and sell accordingly, they cannot recover in this action.

The remarks under the seventh point apply in the main to this one also.

*Eleventh.* The court erred in refusing to charge, that even if plaintiffs did not consent that defendant should himself make such guaranteed proposal and sell accordingly, yet if the blankets in question could not have been sold to the United States except upon a guaranteed proposal, and the plaintiffs refused to render or unite in such guaranteed proposal, they cannot recover in this action.

For the reasons given under the fourth point, the giving such an effect as plaintiffs claim to the contract sued on tended to prevent, and if carried far enough might seriously interfere with Government procuring articles of absolute necessity to the maintenance of its army in time of war.

*Twelfth.* If the defendant was liable for damages for

breach of his contract, the court erred in directing a verdict for the sum of $4,183.30. The court thus directed a verdict for the whole amount of the commissions which the plaintiffs would have earned under the contract, if they had sold the goods; whereas the measure of damages in case of liability is not what the plaintiffs would have received in gross, if they had themselves made the sale as consignees, but what their profit would have been, thus reducing the amount of their commissions by all those charges which under the contract they were to assume or pay, as insurance, storage, guaranty of purchase money, &c. Now it appears on their own evidence that they regarded the purchaser as a party, whose promise to pay they were unwilling to guarantee, and it is evident on their own statements, that, though they were willing defendant should make the trade, they were not willing to make the same sale themselves for the customary commission. The evidence tended to show that in their judgment their commissions would not cover the expense and risks of the transaction, including the guaranty, and if they were right in this, the damrges would be nominal only. And it is no answer to this suggestion to say that if the goods had been consigned to them, they might have sold to other parties and so have made a profit, for the goods were sold to the United States with their consent, and without that consent would not have been made to be sold at all.

But even if the damages would not have been merely nominal, they would at any rate have been something less than the gross amount of the commissions; and so the question should have been submitted to the jury.

*By the court,* BARNARD, J. The agreement between the parties was properly admitted. It was duly acknowledged by one of the plaintiffs' firm, and by the defendant, to have been properly signed, and was attested by a subscribing witness at their request. It is clear that the partners authority to execute the sealed instrument was ratified by the subsequent acts of the plaintiffs under it, even if there was

a failure of proof of authority existing at the execution of the paper.

The agreement was mutual—defendant agreed to deliver to plaintiffs "all the blankets of his manufacture, to be sold by them." This must be fairly construed to mean that the plaintiffs agreed to sell the blankets which defendant should deliver them for that purpose, and the parties mutually agree upon the commission for such sales. The agreement was not in restraint of trade. No restriction is put upon the defendant; he may manufacture as largely as he will. Of course it was for the interest of both parties to manufacture and sell if a profit could be made.

The agreement did not permit the defendant to sell blankets of his manufacture himself without breach of the agreement; he had agreed to "consign exclusively" to the plaintiffs "all the blankets of his (defendant's) manufacture."

If the agreement is established and is not void, and did not permit the defendant to sell directly blankets of his manufacture, then as the defendant did sell the blankets as specified in the complaint, it has been broken, and some defense must be made to it or the plaintiffs are entitled to recover. The paper must be held to contain the true agreement between the parties. All preceding and contemporaneous agreements were merged into the writing, and it was therefore right to reject the evidence offered as to a previous parol agreement in addition to the writing itself. There remains but the alleged promise by the plaintiffs to be defendant's sureties upon a contract to be obtained of the United States Government by defendant to sell his blankets to the Government. If this fact is true it is no defense.

The plaintiffs were not bound to guaranty that the defendant would make and deliver to the Government the blankets within the time and in the manner called for by the Government. They had the right to recede if they had promised. It can have no effect on this agreement. The plaintiffs, upon the whole case, were entitled to recover. There seems at the trial to have been no objection as to the amount of the recovery. A verdict was directed for seven and a half

per cent on the sales to the Government. The plaintiffs were ready and willing to perform on their part, and that defendant made the sale without their assistance, and not through them, would not relieve the defendant from payment of the full commission.

Judgment affirmed with costs.

LEONARD, J. I concur with Judge BARNARD. When the plaintiffs told defendant that they would not enter into a guaranty of his contract to the Government, and that he might meet other parties who would carry it out the best way he could, the subject of the defendant's contract with the plaintiffs in respect to the consignment and sale of his manufactures was not under consideration. The defendant was urging the plaintiffs to become his sureties; they were unwilling to do so; represented to him the great danger of loss by the depreciation of Government pay. The defendant still urged them; stated that he had become bound himself by signing a contract with the Government, and had purchased sixty thousand dollars worth of stock, which he must pay for in sixty or ninety days, and that he depended on the plaintiffs for the money. Then the plaintiffs refused to sign the bond, and told him in substance that he might get other parties to become his sureties in the best way he could.

The plaintiffs, so far as the case shows, were under no obligation to the defendant to advance him money, or to become his security upon the contract with the Government. No doubt the defendant expected them to do so, and it is very probable that they had given the defendant incouragement that they would aid him in the manner he desired; but the contract between the parties did not call for it. The contract, however hard the rule, must be our guide. I can find nothing in this evidence which indicates an intention on the part of the plaintiffs to release the defendant from the performance of his agreement with them. What they said or did was not inconsistent with the performance of the contract with the defendant on their part, nor with insisting upon a like performance by him.

The judgment should be affirmed. I have written my views on this point only, as the court concur wholly upon every other subject in the case.

INGRAHAM, P. J. I dissent upon the point as to the right of the plaintiffs to commissions on the goods sold to the Government. From the evidence, their consent to defendant selling to the Government might be inferred. If not, still there was evidence enough to submit to the jury the question whether the plaintiffs did not give such consent.