(21 App. Div. 290.)

NATIONAL HARROW CO. v. E. BEMENT & SONS.

(Supreme Court, Appellate Division, Fourth Department. September 22, 1897.)

1. COMBINATIONS—WHEN ILLEGAL—CONSTRUCTION OF STATUTES.
    Laws 1897, c. 384, § 7, prohibiting a combination of persons "for the creation of a monopoly or the unlawful restraint of trade, or for the prevention of competition in any necessary of life," is disjunctive, and hence a combination having for its end one of the three things prohibited is within the statute.

2. SAME—SUBJECT OF COMBINATION—FARM IMPLEMENTS.
    A float spring-tooth harrow is an instrument of such general use and utility as to render combinations formed to control its price and production violative of public policy.

3. SAME—PATENTED ARTICLES.
    A combination to control the price and production of a certain article may be illegal, though its manufacture is protected by patents.

4. CONTRACTS—ILLEGALITY—ESTOPPEL TO ASSERT.
    A party to a contract that is illegal because it seeks to control the price and production of an article of general use is not estopped to question the validity of the contract in an action for specific performance.

5. COMBINATIONS—CONTROL OF PRICES AND IMPROVEMENTS—VALIDITY.
   A combination among manufacturers of spring-tooth harrows, by which each manufacturer assigns to a corporation, organized for the purpose, the patents under which he is operating, and takes back an exclusive license to make and sell the same style of harrows previously made by him, and no other, all the. parties being bound to sell at uniform prices, is illegal, as seeking to control prices for a long term of years, and as tending to prevent further improvement in harrows by the licensees.

6. SAME—CONSTRUCTION OF CONTRACT.
   The fact that the licenses fixed the prices at 40 per cent. above the value of harrows, authorizing the licensees to make a 40 per cent. reduction, and then provided that the corporation licensor might decrease the prices at which the harrows should be sold, but should not increase the contract prices, as effectually controlled the price for all purposes as though the power to increase had been expressly reserved to the corporation.

Appeal from judgment on report of referee.

Action by the National Harrow Company against E. Bement & Sons, a corporation. From a judgment in favor of plaintiff, entered on the report of a referee, for $20,985 damages and $1,535.23 costs, and adjudging that defendant specifically perform certain contracts, and be restrained from violating them, defendant appeals. Reversed.

Argued before HARDIN, P. J., and FOLLETT, ADAMS, GREEN, and WARD, JJ.

H. J. Cookinham, for appellant.
William P. Quinn and Edwin H. Risley, for respondent.

FOLLETT, J. This action was begun October 10, 1894, to compel the defendant to account for harrows sold pursuant to two contracts called "licenses," dated April 1, 1891, and to recover damages for sales alleged to have been made in violation of the licenses, and for a judgment restraining the defendant from making future sales in contravention of such licenses. In effect, the action is to compel the defendant specifically to perform the contracts entered into between the litigants April 1, 1891, and to recover damages accruing before the commencement of the action for the violation of the contracts. Immediately before September, 1890, there were about 20 firms and corporations in the United States engaged in the manufacture of float spring-tooth harrows under various patents. Among several of these firms and corporations litigations had arisen over alleged infringements. On the 2d of September, 1890, six of these manufacturers, the defendant not being one, organized a corporation under the laws of this state, known as the National Harrow Company, having its principal office at Utica, N. Y. This corporation, though nominally organized for the purpose of manufacturing and dealing in harrows, never engaged in manufacturing or selling them, and, so far as it appears, had no cash capital, but its stock was issued for patents assigned to it. By an agreement executed by the defendant and other manufacturers it was agreed that they would assign the patents which they severally held to the National Harrow Company, and receive therefor their value in stock, and, in case the manufacturers should be unable to agree as to the value of their respective patents, it was provided that their value should be ascertained by three arbi-

464   47 NEW YORK SUPPLEMENT   (Sup. Ct.

and 81 New York State Reporter.

trators, and that each manufacturer assigning patents should receive stock in the National Harrow Company equal in amount to the value placed on the patent by the arbitrators. Under this arrangement 85 patents were assigned to the National Harrow Company of New York, for which stock was issued to the assignors at the value appraised, or at the value agreed on. By the contracts entered into between the manufacturers and the National Harrow Company it is apparent that this corporation was formed solely for the purpose of receiving assignments of the various patents under which the manufacturers were engaged in making harrows, and to grant licenses to the various manufacturers to continue to make the same kind of harrows they had previously made, and to fix the price at which their harrows should be sold. By the terms of these contracts it appears conclusively that it was the purpose of the combination to restrict the right of the several manufacturers who should receive licenses to the manufacture of the same kind of harrows which they had previously made. In June, 1891, the defendant—a corporation organized under the laws of the state of Michigan—and the National Harrow Company entered into two contracts, dated April 1, 1891, by which the National Harrow Company granted to the defendant the right to manufacture at Lansing, in the state of Michigan, and to sell throughout the United States, four kinds of float spring-tooth harrows, harrow frames without teeth, and attachments applicable thereto, "which apply to and embrace the peculiar construction employed by E. Bement & Sons during the term of such patents, or any or either thereof, applicable to and embracing such construction." The four kinds of harrows are described in Schedule A, and samples of them were left in the possession of the National Harrow Company. By one of the provisions of these contracts the defendant was authorized to make and sell the same kind of harrows it had been accustomed to manufacture under its patents before they were assigned, without being exposed to claims made for infringements under patents originally issued to others. The same kind of licenses or contracts was issued to other manufacturers, each manufacturer being authorized to make the same kind of harrow it had formerly made, and no others. By the first subdivision of these contracts the defendant bound itself to pay to the National Harrow Company, as royalties, the sum of one dollar for each and every float spring-tooth harrow or float spring-tooth harrow frame without teeth sold by it pursuant to the terms of the contracts or licenses. By the second and fourth subdivisions of the contracts it is provided that the defendant shall not sell float spring-tooth harrows, float spring-tooth harrow frames without teeth, or attachments applicable thereto, manufactured under the contracts, and shall not ship them to others to be sold at a less price, or on more favorable terms of payment, than are set forth in Schedule B of the contracts, which schedule fixes the prices at which harrows shall be sold, and provides that a discount of 43 per cent. may be allowed on the prices fixed on harrows, frames. and teeth sold in 13 of the United States, and that in all other states a discount of 45 per cent. may be allowed on sales. By the fourth subdivision the National Harrow Company reserves the right to decrease

the selling prices of harrows, and to make the terms of payment and delivery more favorable to the purchasers. By the sixth subdivision of the contracts it is provided that the defendant shall not, directly or indirectly, manufacture or sell any float spring-tooth harrows, or float spring-tooth harrow frames without teeth, or attachments applicable thereto, other than those it was authorized to manufacture by the terms of the contracts, except such harrows as it may manufacture for any other licensee of the National Harrow Company, and then that it shall manufacture only such harrows as such other licensee shall be licensed by the National Harrow Company to manufacture and sell. By the seventh subdivision of the contracts it is provided that the defendant shall pay to the National Harrow Company five dollars for every float spring-tooth harrow, float spring-tooth harrow frame without teeth, or attachments applicable thereto, which shall be sold contrary to the strict terms of the licenses, which sum is agreed on as the liquidated damages for such violation of the contracts. By the ninth subdivision of the contracts the defendant is prohibited from licensing any other person, firm, or corporation to manufacture or sell any float spring-tooth harrows, float spring-tooth harrow frames without teeth, or attachments applicable thereto; and by the tenth subdivision it is provided that the defendant shall not manufacture or sell, directly or indirectly, any different style of float spring-tooth harrow, float spring-tooth harrow frames without teeth, or attachments applicable thereto, than those described in Schedule A, and samples of which were deposited with the National Harrow Company. The same form of contract or license was issued to all the licensees by the National Harrow Company. After these licenses or contracts had been granted to the defendant and other manufacturers, the parties in interest organized a corporation under the laws of the state of New Jersey under the name of the National Harrow Company, and the New York corporation of the same name assigned to the New Jersey corporation all of its patents, contracts, and property, except about $1,000, and received therefor stock to the amount of the value of the patents as fixed, which stock was afterwards distributed among the manufacturers, each manufacturer receiving the same number of shares in the new corporation that it held in the New York corporation. For some time the defendant made reports of the harrows which it sold, and paid the royalty according to the terms of the contracts, but subsequently it, as is found by the referee, refused to make reports of the harrows manufactured, and to pay the royalty prescribed by the contracts. Because of this alleged violation of the contracts this action was brought to recover of the defendant the stipulated damages of five dollars for each harrow sold by it and not reported, and also to compel it in the future specifically to perform the contracts.

It is apparent that the plaintiff and its predecessor, the National Harrow Company of New York, were not organized for the purpose of manufacturing or dealing in float spring-tooth harrows, but for the purpose of bringing the manufacturers of such harrows under the control of a single corporation having the power to fix the prices at which such harrows should be sold, and to limit the manufacturing

47 N.Y.S.—30

of harrows to the kinds in use on the 1st day of April, 1891, and to limit each licensee of the National Harrow Company to the manufacture of such harrows as the licensee had made and sold under his patents prior to their assignment, unless the licensee should become a sublicensee of some other licensee of the National Harrow Company. The contracts entered into by the manufacturers preliminary to the organization of the New York corporation disclose these purposes, which are sought to be carried out by the contracts or licenses A and B, dated April 1, 1891, copies of which are attached to the complaint, and on which this action is brought. It is contended that, because the contracts do not authorize the plaintiff to raise the prices of harrows above those fixed in the contracts, but simply authorize the plaintiff to decrease the prices at which harrows shall be sold, it is not a provision void as against public policy. By these contracts the prices of harrows are fixed, but the defendant is authorized to sell them at from 43 to 45 per cent. less than the prices fixed. A contract fixing the prices of harrows at more than 40 per cent. above their value or selling prices, and authorizing the licensor to reduce, but not to increase, the prices, as effectually controls the price, for all practical purposes, as though the power to increase had been expressly reserved to the plaintiff. It would hardly be practical to fix the prices at more than 43 or 45 per cent. above the selling prices of the harrows. The case shows that, by reason of the fall in prices of materials and labor, harrows could be manufactured at the date of the trial of this action for 68 per cent. of their cost in April, 1891, but the defendant and all other licensees of the plaintiff are by their contracts prohibited from lowering the prices, except by the consent of the plaintiff. It seems to me that the provisions of the contracts authorizing, in effect, the plaintiff to fix the prices at which harrows shall be sold during the existence of these patents, and providing that the defendant shall not, directly or indirectly, manufacture or sell any float spring-tooth harrows, or float spring-tooth harrow frames without teeth, or attachments applicable thereto, other than those it is authorized to manufacture by the terms of the contracts, are void as against public policy. No matter what improvements are made in float spring-tooth harrows, this defendant and all other licensees of the plaintiff are prohibited from adopting them, and they are all confined to the manufacture and sale of float spring-tooth harrows covered by the 85 patents specified in the contracts. These provisions not only stifle competition between the plaintiff's licensees, but effectually prevent them from attempting to make any improvement in harrows. That combinations for the purpose of limiting the supply and fixing the prices of articles of general use during long periods are unlawful has been so often decided as not to require the citation of authorities. People v. Milk Exchange, 145 N. Y. 267, 39 N. E. 1062; Arnot v. Coal Co., 68 N. Y. 558; Leonard v. Poole, 114 N. Y. 371, 21 N. E. 707. By section 168 of the Penal Code any combination to injure trade or commerce is a misdemeanor. This section is a substitute for section 8, tit. 6, c. 1, pt. 4, of the Revised Statutes (2 Rev. St. 691), which was repealed by chapter 593 of the Laws of 1886 (section 1, par. 4). When the transactions occurred out of which

this action arose, section 7 of chapter 564 of the Laws of 1890 (the stock corporation law) provided:

"Sec. 7. Combinations Prohibited.—No stock corporation shall combine with any other corporation or person for the creation of a monopoly or the unlawful restraint of trade or for the prevention of competition in any necessary of life."

By chapter 384 of the Laws of 1897 the section was amended so that it now reads as follows:

"Sec. 7. Combinations Abolished.—No domestic stock corporation and no foreign corporation doing business in this state shall combine with any other corporation or person for the creation of a monopoly or the unlawful restraint of trade or for the prevention of competition in any necessary of life."

The licenses or contracts A and B were entered into by the National Harrow Company of New York, and, being designed "for the creation of a monopoly," and to effect "the unlawful restraint of trade," are void, under the section last quoted, as being beyond the power of the corporation. The words "necessary of life" do not control the entire section, but only limit and control the words following the last disjunctive in the section. The section is a disjunctive one, and prohibits corporations from combining to accomplish three things: (1) "Creation of a monopoly," (2) "the unlawful restraint of trade," and (3) "the prevention of competition in any necessary of life." The plaintiff, the successor of the New York corporation, stands in the shoes of its predecessor in respect to these contracts, and they, being void when entered into, are void in the hands of the plaintiff.

The contention that a float spring-tooth harrow is not an instrument of such general use and utility as to render combinations formed to control its price and production violative of public policy cannot be maintained. A harrow is an implement as important and as generally used by farmers as a plow, and is quite as necessary for the proper cultivation of land as any other agricultural implement, and is in use on every properly cultivated farm. Float spring-tooth harrows have come into general use, and have largely superseded the old-fashioned square and three-cornered harrows or drags having peg teeth, and I think it needs no argument to show that a combination formed for the purpose of controlling the prices, limiting the production, preventing competition among manufacturers, and also preventing further improvement in them, is contrary to public policy as declared by the statutes of this state, and by a long line of decisions in this and other jurisdictions. Indeed, it has been held in three cases in which this plaintiff and its predecessor, the New York corporation of the same name, were parties, that a combination to restrain the production and control the prices of these harrows was contrary to public policy and void. Strait v. Harrow Co. (Sup.) 18 N. Y. Supp. 224; Harrow Co. v. Quick, 67 Fed. 131; Harrow Co. v. Hench, 76 Fed. 667.

It is urged by the learned counsel for the plaintiff that, because float spring-tooth harrows are patented articles, therefore the patentees or their assignees may combine to limit the production or regulate the prices of the articles. This argument is based upon the theory that all patents during their existence create a monopoly of the arti-

cle patented, and that the owner of the patent may manufacture or refuse to manufacture the article, and fix his own price upon it. It was said in Heaton Peninsular Button-Fastener Co. v. Eureka Specialty Co., 47 U. S. App. 166, 25 C. C. A. 272, and 77 Fed. 293, that:

"The right of a patentee is, after all, but a property right, and subject, as is all other property, to the general law of the land. We may also concede that contracts respecting the use of inventions and discoveries are, like all other contracts, subject to the limitations imposed by definite principles of public policy."

It seems to me that the contention that all the telephone patentees could assign their patents to a single corporation for the purpose of limiting the prices at which instruments should be sold, and preventing all competition in their production, cannot be sustained on the ground that their rights, being protected by patents, are, in effect, monopolies created by the government, and that a combination of all these smaller and legalized monopolies into one great monopoly would not be against public policy. This question was also considered and held against the plaintiff in Harrow Co. v. Hench, 76 Fed. 667.

The position that because the defendant, being a party to these contracts which it now seeks to have declared illegal, is estopped from questioning their validity, cannot be maintained. That question was considered and determined adversely to the plaintiff's contention in Leonard v. Poole, 114 N. Y. 371, 21 N. E. 707.

I am of the opinion that the contracts sought to be enforced are void as against public policy, because by them it is sought to control for a long period of years—during the life of the patents—the prices of float spring-tooth harrows, and to limit during the same period the manufacturers licensed by the plaintiff and by its predecessor to the production of float spring-tooth harrows described in the licenses, and because the effect of the contracts is to prevent further improvement in harrows by the licensees of the plaintiff or of its predecessor. This contention is supported by the three cases above cited, in which the plaintiff and its predecessor were parties.

The judgment should be reversed, and a new trial granted, with costs to abide the event. All concur.