(55 Misc. Rep. 72.)

PEOPLE v. KLAW et al.

(Court of General Sessions, New York County. June, 1907.)

1. MONOPOLIES—CRIMINAL CONSPIRACY—RESTRAINT OF TRADE.

The owners of certain theaters throughout the country arranged for booking attractions so as to enable their companies to save expense by making continuous tours, and agreed not to produce attractions controlled by rival interests, and also only such attractions as agreed not to play in rival theaters, and not to play in certain cities during a specified time, and not to play in other theaters covered by such booking contracts. *Held* not to constitute the crime of conspiracy, in violation of Pen. Code, § 168m, subds. 5, 6, as unlawfully creating and maintaining a monopoly, or conspiring to commit an act injurious to trade or commerce.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 35, Monopolies, §§ 10–13.]

2. SAME—COMMERCE.

Owning, controlling, and leasing theaters and producing plays and booking contracts for the production of plays, are not "commerce" within Pen. Code, § 168, subds. 5, 6, prohibiting a conspiracy to commit any act injurious to trade or commerce.

Marc Klaw and Abraham L. Erlanger were indicted for the crime of conspiracy. Motion to dismiss indictment granted.

See 104 N. Y. Supp. 482.

Edward Lauterbach, Alfred Lauterbach, Levy Mayer, and P. J. Rooney, for the motion.

Israel J. Kresel, Asst. Dist. Atty., opposed.

ROSALSKY, J. On the 31st day of January, 1907, the grand jury of the county of New York filed an indictment, accusing the above-named defendants, with others, of the crime of conspiracy, in violation of subdivisions 5 and 6 of section 168 of the Penal Code of the state of New York. The indictment charges that the defendants, with the

other individuals named, for the purpose of unlawfully removing and destroying competition among themselves, and between themselves, and others engaged in similar occupations and businesses, and for the purpose of unlawfully creating and maintaining a monopoly in the county of New York and elsewhere in the said occupations and businesses, unlawfully combined to control and monopolize in the county of New York and elsewhere the said occupations and businesses, and to exclude and prevent all other persons from engaging in said occupations and businesses, and to destroy competition in the said occupations and businesses, and each of them, and to prevent other persons by force, threats, and intimidation from exercising their lawful trades and callings in the county of New York, to wit, the said lawful trades and callings of owners and lessees of theaters, owners, and producers of plays, and booking agents.

It is also charged that the overt acts in furtherance of the conspiracy were the following: (1) The making of the agreement of August 31, 1896. (2) The making of the agreement of April 23, 1900. (3) The making of the agreement between the defendants and Felix R. Wendelschaefer on August 17, 1903, whereby the said defendants obtained the exclusive control of the bookings of a theater controlled by the said Wendelschaefer, located in the city of Providence, in the state of Rhode Island. (4) The contract made on February 7, 1905, by the defendants and Wendelschaefer for the production of a theatrical attraction by the name of May Irwin in the Providence Opera House, in Providence, R. I., this being the theater, the exclusive bookings for which had been placed in the control of the defendants. (5) The transmission of the contract last above described by the defendants to Felix R. Wendelschaefer. (6) A threat by the defendants to one Lee Shubert on or about July 1, 1905, to the effect that the defendants would refuse to permit any attractions owned by them to be produced in any of the theaters owned or controlled by the said Shubert, and would refuse to permit any of the attractions owned or controlled by said Shubert to be produced in any of the theaters controlled by the said defendants and the other parties to the agreement, unless the said Lee Shubert should break and repudiate a certain contract which was then and there existing between the said Lee Shubert and one David Belasco for the presentation by the said David Belasco of certain attractions owned by him in the theaters owned by the said Lee Shubert. (7) A threat by the defendants to one William F. Connor, in the month of December, 1905, to the effect that unless the said Connor would repudiate a certain contract which was then and there existing between him and the said Lee Shubert, under the terms of which the said Connor and the said Shubert were jointly to manage a theatrical tour in the United States for one Sarah Bernhardt, he, the said Erlanger, and the other defendants, would refuse to permit the production of any play or theatrical attraction in which the said Sarah Bernhardt should act in any of the theaters controlled by the defendants. Thereafter an order was granted for leave to the defendants to inspect the stenographic minutes of the evidence and proceedings before the grand jury.

The defendants now move to dismiss the indictment, upon the following grounds: (1) That the evidence fails to show any crime as

having been committed by the defendants herein. (2) That the crime, if any such be shown, was not committed within the county of New York, within the period prescribed by the statute of limitations. (3) That illegal, incompetent, immaterial, improper, and prejudicial evidence against the defendants was admitted upon the inquiry before the grand jury. (4) Upon all the grounds mentioned in sections 313 and 671 of the Code of Criminal Procedure of the state of New York.

To maintain the accusation against the defendants, testimony was presented to the grand jury tending to sustain the allegations of the indictment. Subdivisions 5 and 6 of section 168 of the Penal Code provide as follows:

"If two or more persons conspire, either (5) to prevent another from exercising a lawful trade or calling, or doing any other lawful act, by force, threats, intimidation,  *  *  *  or (6) to commit any act injurious  *  *  *  to trade or commerce,  *  *  *  each of them is guilty of a misdemeanor."

Section 171 of the Penal Code defines an overt act, and provides as follows:

"No agreement except to commit a felony upon the person of another, or to commit arson or burglary, amounts to a conspiracy, unless some act besides such agreement be done to effect the object thereof, by one or more of the parties to such agreement."

Prior to the adoption of the Penal Code in 1881, there was no provision corresponding to subdivision 5 of section 168 of the Penal Code; this section being the creation of the authors of the Penal Code.

The defendants claim, first, that they did not conspire to prevent any person from exercising his lawful trade or calling; and, secondly, that the owning, controlling, and leasing of theaters, the producing of plays or entertainments of the stage and the booking of contracts for the production of plays, in accordance with the agreements hereinbefore referred to, is not an article of trade or commerce, and that, therefore, the defendants did not commit acts injurious to trade or commerce.

The first question to be determined is whether the defendants conspired to prevent any person from exercising his trade or calling. In the case of People ex rel. Burnham v. Flynn, 114 App. Div. 578, 100 N. Y. Supp. 31, the defendant was charged with the violation of subdivision 5 of section 168 of the Penal Code. The relator Burnham was a manager of a theater and a member of the "Theater Managers' Association of the City of New York," the members of which entered into an agreement, alleged to have constituted a criminal conspiracy, to prevent one James S. Metcalf, a dramatic critic and writer, from exercising his lawful calling of critic and writer and from entering any of the theaters managed by the association, and by the carrying out of such agreement and forcibly preventing him from entering a theater after he had purchased a ticket of admission. The Appellate Division of this Department, by a unanimous opinion, held that the defendant violated no law and discharged him from custody; the court saying:

"Assuming that the occupation of critic is a trade or calling, and that the agreement made by the relator with other members of the association, and the overt acts on the part of some of them carrying it into effect, come within the letter of the law above quoted, whether or not a crime was committed depends upon whether the agreement was a corrupt or unlawful one, and

whether the acts employed to carry it out, by excluding the complainant from various theaters, were also unlawful. * * * The relator and his associates did not therefore enter into an unlawful agreement when they agreed amongst themselves that the complainant should not be admitted to the various theaters managed by them. If they disliked his presence, or thought his attendance was injurious to their business, they could agree that he should not be permitted to attend. If he attempted to do so, their place of amusement being their own, and being a private place so far as any individual or the public was concerned, they had a right, by such reasonable force as was necessary, to prevent him from entering. Their acts therefore in so preventing him were not unlawful acts. In People v. Kostka, 4 New York Cr. R. 429, relied upon by the respondents, the overt acts which the defendants committed were unlawful and intimidating and threatening. Any number of men may combine to do a lawful act, and such combination does not subject them to either civil or criminal liability. National Protective Association v. Cumming, 170 N. Y. 315, 63 N. E. 369, 58 L. R. A. 135, 88 Am. St. Rep. 648. It only remains to be considered whether or not the agreement entered into was actuated by the sole motive of preventing the complainant from exercising his lawful calling of critic. The resolution negatives any such idea, and there is no evidence from which it can be assumed that such was the motive of the agreement, or that such a motive actuated the subsequent acts of excluding him. The resolution dwells particularly upon the fact that complainant had been unfair in his attacks upon certain members of the association, and it is especially stated that no mention is made of criticisms on plays or business matters. Whether these attacks had been made or not, and whether they were justified or unjustified, is immaterial. If the members of the association thought they were unfair or disliked them, and desired, for that reason alone, that the complainant should not attend the various entertainments provided by them, they had a right to agree to exclude him and to carry out that agreement by refusing to admit him. It cannot be said that their sole motive in doing what they did was to prevent the complainant from exercising his lawful calling of critic. On the contrary, what was done appears to have been actuated by an unfounded or well-founded dislike of complainant and disapproval of his writings. The wisdom of the acts or the propriety or seemliness or unseemliness does not concern us. The only question to be determined is whether the acts were unlawful, and our conclusion is that the facts disclosed do not constitute the crime of conspiracy, and that the relator should have been discharged."

Tested by the principles laid down in this case, it seems that there must be a corrupt agreement between two or more individuals entered into with a criminal intent to do an unlawful act, which must be followed by the doing of an unlawful act, and that the motive for the agreement is to prevent some one from exercising a lawful trade or calling, since "a conspiracy is a combination to do an illegal act by legal means, or any act by illegal means."

The evidence presented to the grand jury disproves that such was the purpose of these defendants. The record discloses that in 1896 the defendants and other parties, being the owners and in control of certain theaters throughout the country, and engaged in the production of theatrical amusements or entertainments of the stage, entered into an agreement for a period of five years. The agreement recited that the parties were interested in or held leases of various theaters and places of amusement in the United States, and that the theatrical business, as theretofore conducted by the various parties, had resulted in great losses from indiscriminate bookings, in consequence of which similar attractions of the first class repeatedly opposed each other in the same place, and thereby injured each other by causing the public to choose be-

tween them; that, unless tours were arranged in as nearly a direct line as possible, needless expense resulted from railroad fares and the too frequent hauling, backward and forward, of theatrical paraphernalia because of the geographical location of theaters and places of amusement; and that to guard against losses of a similar character, and for the benefit and protection of the parties to this agreement, each of the parties contributed some of the theaters owned or controlled by him, in order to establish a continuous chain of theaters, throughout the United States, at which their several attractions could be produced in turn, the bookings being arranged in conjunction with each other—that is to say, no attraction was to be booked in any of the said theaters or places of amusement which would insist on playing in an opposition theater or place of amusement in any of the cities in which the parties to this arrangement owned or controlled theaters, unless the party having the theater or place of amusement in said competitive place should give his or their consent in writing to permit said attraction to be produced in the opposition theater or place of amusement. Another provision of the agreement bound the parties either to play their attractions in the theaters owned by the parties to the agreement, or to remain out of the cities in which said theaters or places of amusement are respectively located, unless consent to play in an opposition theater was obtained from the party having the theater at the competitive point. Each of the parties to the agreement was to perform certain duties, and the net profits and other income derived from the theaters were to be divided between them in equal shares or proportions. Provision was also made for bringing in other theaters from time to time under the terms of the contract.

On April 23, 1900, another agreement was entered into between the same parties, for a period of five years, beginning August 31, 1901, which recited, among other things, that tours had been advantageously arranged under the previous agreement, thereby saving much expense in railroad fares and in moving of companies from point to point, and that a large number of persons engaged in the theatrical business had been benefited under the first agreement, and that they were able to play their various attractions in the different cities of the United States and Canada in such a manner that other companies of the same or different class were not permitted to play against them in the same place during the same week or time, thus giving every company playing in the city full opportunity to reap all the benefits which could possibly be obtained. This agreement contains substantially the same provisions as those contained in the agreement of August 31, 1896. In accordance with the provisions of these agreements, a very large number of booking contracts have been entered into, from time to time, by the parties herein, and with third parties owning or managing plays or attractions.

In pursuance of the terms of the so-called booking contracts, the parties therein, acting as directors and agents of and for the theaters or managers thereof, agreed to furnish to the parties specified in the agreement a particular theater, with equipment and employés, for a specified period, and the owners of the attraction, in consideration thereof, agreed to furnish complete scenic properties and everything

necessary to the proper production of the play or entertainment of the stage. The contracts contained the following stipulations:

"The party of the second part further agrees that without the written consent of the party of the first part, he will not allow said combination, star, or company to play or to be advertised to play or perform at any theater in the city of  *  *  *  during the present season or prior to the fulfillment of this contract, or within four weeks thereafter, except on agreement indorsed on this contract. In case the party of the second part violates this condition, he hereby agrees to pay said parties of the first part as liquidated, stipulated and agreed damages, and in nowise as a penalty, the sum of one thousand dollars."

"It is finally mutually agreed, and this contract is made upon the express understanding and condition that the party of the second part will not, except upon the written consent of the first parties, book or play the attraction hereby booked in any other theater or place of amusement in the United States or Canada during the theatrical season covered by this agreement, and will only play the attraction in such theaters or places of amusement as are controlled by the parties of the first part, and for a violation of this agreement the parties of the first part may cancel the time hereby booked on one day's notice to be mailed to the last known address of the said party of the second part."

Under the agreement of 1896, no theater in the county of New York owned or controlled by the defendants, or any of the parties therein, had been contributed to the general scheme of the chain of theaters; while, under the agreement of August 31, 1901, only one theater in the county of New York, the Knickerbocker Theater, was contributed by the defendants to the general scheme of the chain of theaters.

Lee Shubert, a witness before the grand jury, testified, among other things, that he was in the business of managing and owning theatrical attractions, and managing, owning, and leasing theaters; that from 1900 until the present time he had under his control the following theaters in the county of New York: Herald Square Theater, Lyric Theater, Princess Theater, and Madison Square Theater; in Chicago, the Garrick Theater; a theater in St. Louis, and the Belasco Theater in Washington—that he successfully produced plays at his various theaters, and was also engaged in the business of booking plays or entertainments of the stage for others.

Before the grand jury the witness was asked the following:

"Q. If you were going on the road, you cannot lay out a continuous route; you have got to see-saw?"

To which question the witness replied:

"Yes; we have to. It costs us more in railroading than we can possibly take in some weeks in order to make the points."

David Belasco, another witness, among other things, testified that he was engaged in writing and producing attractions, and had been so engaged for the past 25 or 30 years; that since 1896 he had produced several plays which were performed in various theaters and places of amusement in the county of New York and in other cities of the United States; that nearly all of his plays had met with great success, and that large profits were derived therefrom; and that he had been for many years and was the lessee of the Belasco Theater in the county of New York.

The statement of Shubert, "that you cannot lay out a continuous route unless you see-saw, and that under such circumstances it costs us

more in railroading than we can possibly take in some weeks in order to make the points," furnished the strongest incentive for the defendants to enter into the agreements referred to, for the purpose of preventing losses in their business. The testimony clearly shows that, instead of Shubert and Belasco being prevented from exercising a lawful trade or calling, they, on the contrary, were able to own, lease, and control theaters and produce plays, and that Shubert also conducted a booking agency. On one occasion, Belasco, finding himself unable to hire a theater in the city of Washington, obtained a hall, fitted it up as a theater, at an expense of $25,000, and produced a play which met with financial success. Can it be said that, because Shubert and Belasco were subjected to inconvenience and expense, that they were prevented from exercising a lawful trade or calling? To put the question is to answer it. The defendants were engaged in a private business, and hence were not obliged to aid a business rival by permitting him to use their private business premises. They had the undoubted right to book, or to refuse to book, any production that they saw fit, and to maintain and close any of their theaters at their option. There was no motive on the part of the defendants to injure Shubert, Belasco, or any other person. Their motive was to promote their own business, and to refuse to do business with persons who should produce attractions with their rivals. Although the agreements contained certain restrictions and although they may have subjected their competitors to expense and inconvenience, there can be no criminal conspiracy under subdivision 5 of section 168 of the Penal Code, since the purpose of the defendants, as well as the methods pursued by them under the agreements, were not unlawful; nor does the evidence show that the defendants committed any illegal act by legal means, or any act by illegal means.

The conclusions I have reached enunciate the policy of the law of this state with reference to agreements of this character, as will appear from the following authorities:

In the case of Park & Sons Co. v. Nat. Druggists' Ass'n, 175 N. Y. 21, 67 N. E. 143, 62 L. R. A. 632, 96 Am. St. Rep. 578, the Court of Appeals says:

"It will be seen, therefore, that this is a controversy between opponents in business, neither side trying to help the public. Nor will the public be the gainer by the success of either. The motive behind the action of each party is self-help. It is the usual motive that inspires men to endure great hardships and take enormous risks that fortune may come. In the struggle which acquisitiveness prompts but little consideration is given to those who may be affected adversely. Am I within my legal rights? is as near to the equitable view as competitors in business usually come. When one party finds himself overmatched by the strength of the position of the other, he looks about for aid. And quite often he turns to the courts, even when he has no merit of his own, and makes himself for the time being the pretended champion of the public welfare in the hope that the courts may be deceived into an adjudication that will prove helpful to him. Now, while the courts will not hesitate to enforce the law intended for the protection of the public because the party invoking such protection is unworthy, or seeks the adjudication for selfish reasons only, they will be careful not to allow the process of the courts to be made use of, under a false cry that the interests of the public are menaced, when its real purpose is to strengthen the strategic position of one competitor in business as against another."

In Collister v. Hayman, 183 N. Y. 250, 76 N. E. 20, 1 L. R. A. (N. S.) 1188, 111 Am. St. Rep. 740, it was held that the conducting of a theater is a private business, which the proprietor can open or close at will, admitting as many as he sees fit, and charging what he may choose. "This necessarily follows from the fact that this enterprise is a private one, and not public, and because, while he may entertain the public at large, if he sees fit, he is under no obligation to do so. His rights and duties are not like those of carriers of passengers, for example, who have public franchises and are under obligation to give public service." People ex rel. Burnham v. Flynn, supra. In National Protective Ass'n v. Cumming, 170 N. Y. 315, 63 N. E. 369, 58 L. R. A. 135, 88 Am. St. Rep. 648, the court said:

"Whatever one man may do alone, he may do in combination with others, provided they have no unlawful object in view. Mere numbers do not ordinarily affect the quality of the act."

In the case last quoted the court also held that a labor union may refuse to permit its members to work with fellow servants who are members of a rival organization, may notify the employer to that effect, and that a strike will be ordered unless such servants are discharged, where its action is based upon a proper motive, such as a purpose to secure only the employment of efficient workmen, or to secure an exclusive preference of employment to its members, on their own terms and conditions, provided that no force is employed, and no unlawful act is committed. If, under such circumstances, the employés objected to are discharged, neither they nor the organization of which they are members have a right of action against the union or its members. The Cumming Case is not in conflict with the case of Curran v. Galen, 152 N. Y. 33, 46 N. E. 297, 37 L. R. A. 802, 57 Am. St. Rep. 496, since, in the latter case, it was held that if the purpose of an organization or combination of workingmen is to hamper or restrict the freedom of the citizen in pursuing his lawful trade or calling, and, through contracts or arrangements with employers, to coerce other workingmen to become members of the organization, and to come under its rules and conditions, under the penalty of the loss of their positions and of deprivation of employment, such purpose is against public policy and unlawful.

In Jacobs v. Cohn, 183 N. Y. 207, 76 N. E. 5, 2 L. R. A. (N. S.) 292, 111 Am. St. Rep. 730, an agreement made between the defendants and a labor union, whereby the former agreed, for a certain period, to employ and retain only members of the union in good standing, and the latter for the same period bound themselves to furnish the services of its members, was held to be not violative of public policy. On page 211 of 183 N. Y., on page 7 of 76 N. E., 2 L. R. A. (N. S.) 292, 111 Am. St. Rep. 730, the court said:

"The inviolability of the right of persons to freedom of action may well extend to any concert of action for legitimate ends, if consistent with the maintenance of law and order in the community, and if not interfering with the enjoyment and the exercise by others of their constitutional rights. Their right to combine and to co-operate for the promotion of such ends as the increase of wages, the curtailment of hours of labor, the regulation of their relations with their employer, or for the redress of a grievance, is justifiable. Their combination is lawful when it does not extend so far as to inflict injury upon

others, or to oppress and crush them by excluding them from all employment, unless gained through joining the labor organization, or trades union."

In People v. Marcus, 185 N. Y. 257, 77 N. E. 1073, the defendant was charged with a violation of section 171a of the Penal Code, in that he had entered into an agreement not to employ any person who was or became a member of a labor union. The Court of Appeals reversed the judgment of conviction, declaring this section to be unconstitutional, as being an unauthorized restraint upon the freedom to contract. In this case the court reaffirmed the doctrines enunciated in the cases of Nat. Protective Ass'n v. Cumming, and Jacobs v. Cohen, supra. At page 264 of 185 N. Y., at page 1075 of 77 N. E., the court said:

"It would seem as though an employer should be unquestionably free to enter into such a contract with his workmen for the conduct of the business without its being deemed obnoxious upon any ground of public policy. If it might operate to prevent some persons from being employed by the firm, or, possibly, from remaining in the firm's employment, that is but an incidental feature. Its restrictions were not of an oppressive nature, operating generally in the community to prevent such craftsmen from obtaining employment and from earning their livelihood. It was but a private agreement between an employer and his employés concerning the conduct of the business for a year, and securing to the latter an absolute right to limit the class of their fellow workmen to those persons who should be in affiliation with an organization entered into with design of protecting their interests in carrying on the work. That freedom to contract which entitles an employer to make by agreement his place of business wholly within the control of a labor union entitles him, if he so desires, to require of his employés that they be wholly independent of any labor union."

The situation, therefore, is precisely the same as that which existed in the case of Park & Sons v. Nat. Druggists' Ass'n, supra, and the court held that the agreement was in no respect unlawful, since the object of the association was to further the business of its members, and the motive was not to raise prices, or to restrict the supply of the articles to the public, and that the acts of the defendants were not prejudicial to the public welfare.

In Leslie v. Lorillard, 110 N. Y. 519, 534, 18 N. E. 363, 366, 1 L. R. A. 456, the court said:

"It may be said that no contracts are void as being in general restraint of trade where they operate simply to prevent a party from engaging or competing in the same business."

An agreement whereby a business rival was prevented from competing was held to be legal and valid in the following cases: Francisco v. Smith, 143 N. Y. 488, 38 N. E. 980; Diamond Match Co. v. Roeber, 106 N. Y. 473, 13 N. E. 419, 60 Am. Rep. 464; Tode v. Gross, 127 N. Y. 480, 28 N. E. 469, 13 L. R. A. 652, 24 Am. St. Rep. 475; New York Bank Note Co. v. Hamilton Bank Note Co., 180 N. Y. 280, 293 et seq., 73 N. E. 48; Brett v. Ebel, 29 App. Div. 256, 51 N. Y. Supp. 573; Lewis v. Gollner, 129 N. Y. 227, 29 N. E. 81, 26 Am. St. Rep. 516; National Wall Paper Co. v. Hobbs, 90 Hun, 288, 35 N. Y. Supp. 932; Stanley v. Pollard, 5 Misc. Rep. 490, 25 N. Y. Supp. 766; McKinnon Pen Co. v. Fountain Ink Co., 48 N. Y. Super. Ct. 442, appeal dismissed, 93 N. Y. 658; Van Marter v. Babcock, 23 Barb. (N. Y.) 633; Chappel v. Brockway, 21 Wend. (N. Y.) 157; Dunlop v.

Gregory, 10 N. Y. 241, 61 Am. Dec. 746; Hard v. Seeley, 47 Barb. (N. Y.) 428; Hadden v. Dimick, 31 How. Prac. (N. Y.) 196; Pond's Extract Co. v. Humphreys' Specific Homoeopathic Co., 50 How. Prac. (N. Y.) 358; Good v. Daland, 121 N. Y. 1, 24 N. E. 15; Walsh v. Dwight, 40 App. Div. 513, 58 N. Y. Supp. 91; Davies v. Racer, 72 Hun, 43, 25 N. Y. Supp. 293; Ru Ton v. Everitt, 35 App. Div. 412, 54 N. Y. Supp. 896. Nor was it illegal for the defendants to agree that they would do business only with such persons as should refuse to deal with their rivals.

In Lough v. Outerbridge, 143 N. Y. 271, 283, 38 N. E. 292, 296, 25 L. R. A. 674, 42 Am. St. Rep. 712, the court said:

"On this branch of the argument the remarks of Lord Coleridge in the case of the Mogul SS. Co. v. McGregor, 21 Q. B. Div. 552, are applicable: 'The defendants are traders with enormous sums of money embarked in their venture, and naturally and allowably desire to reap a profit from their trade. They have a right to push their lawful trades by all lawful means. They have a right to endeavor, by lawful means, to keep their trade in their own hands, and by the same means to exclude others from its benefits, if they can. Amongst lawful means is certainly included the inducing by profitable offers customers to deal with them rather than with their rivals. It follows that . they may, if they see fit, endeavor to induce customers to deal with them exclusively by giving notice that only to exclusive customers will they give the advantage of their profitable offers. I do not think it matters that the withdrawal of the advantages is out of all proportion to the injury inflicted by those who withdraw them on the customers who decline to deal exclusively with them dealing with other traders.' "

In Walsh v. Dwight, 40 App. Div. 516, 517, 58 N. Y. Supp. 91, 93, the court said:

"Nor can it be that a manufacturer of merchandise cannot agree to sell to others upon condition that the vendees in selling at retail should charge a specified price for the goods sold, or should sell only the manufactured product of the manufacturer. If a dealer in articles of this kind, for his own advantage, agrees to confine his business to a particular line of goods, or agrees with the manufacturers to charge a particular price for the articles which he sells in his business, such an agreement is not illegal as in restraint of trade or as tending to create a monopoly, as there is nothing in the agreement to prevent others from engaging in the business or the manufacturers of other articles from selling their product to any one who is willing to buy. There is nothing to prevent an individual from selling any property that he has at any price which he can get for it; nor is there any reason why an individual should not agree that he will not sell property which he owns at the time of making the agreement, or which he thereafter acquires, at less than at a fixed price, and certainly a contract of this kind is not one which exposes the parties to it to any penalty, or subjects them to an action for damages by those whose business such a contract has interfered with."

The next question to be considered is whether the owning, controlling, and leasing of theaters, and the producing of plays and entertainments of the stage, and the booking of contracts for the production of plays, is an article of trade or commerce, and hence whether the defendants committed acts injurious to trade or commerce. In Webster "trade" is defined as:

"(1) The act or business of exchanging commodities by barter; the business of buying and selling for money; commerce; traffic; barter. (2) The business which the person has learned and which he carries on for procuring subsistence, or for profit; occupation; especially, mechanical employment; distinguished from the liberal arts and learned professions, and from agriculture;

as, we speak of the trade of a smith, of a carpenter, or mason, but we never say, the trade of a farmer, or of a lawyer, or physician."

In the same work "commerce" is defined as:

"The exchange of merchandise on a large scale between different places or communities; extended trade or traffic."

In the Standard Dictionary "trade" is defined as:

"(1) To dispose of by bargain and sale; now especially to barter; exchange; as to trade horses."

And "commerce" is defined as:

"(1) The exchange of goods, productions of property of any kind; especially on a large scale as between states or nations; extended trade; in economics, even grouped with agriculture and manufactures as a branch of production."

In volume 2, Bouvier's Law Dictionary, p. 1127, "trade" is thus defined:

"Any sort of dealings by way of sale or exchange. The dealings in a particular business; as, the Indian trade; the business of a particular mechanic; hence boys are said to be put apprentices to learn a trade; as, the trade of a carpenter, shoemaker, and the like. Bacon, Abr. Master and Servant (D. 1). Trade differs from art."

Trade has been defined as the exchanging of commodities for other commodities or for money. Commerce has a broader meaning. It consists of intercourse and traffic and includes transportation of persons and property and the navigation of public waters for that purpose. U. S. v. Cassidy (D. C.) 67 Fed. 698; U. S. v. Coal Dealers' Ass'n (C. C.) 85 Fed. 252.

In Gibbons v. Ogden, 22 U. S. 1, 6 L. Ed. 23, "commerce" is defined to mean not only traffic, but also intercourse, and this definition has been approved in many cases. Henderson v. Mayor, 92 U. S. 259, 23 L. Ed. 543; Welton v. Missouri, 91 U. S. 275, 23 L. Ed. 347; Railroad Co. v. Husen, 95 U. S. 465, 24 L. Ed. 527.

The words "trade" and "commerce" are said by Jacobs, in his Law Dictionary, not to be synonymous, that commerce relates to dealings with foreign nations. Trade, on the contrary, means mutual traffic among ourselves, or the buying, selling or exchange of articles between members of the same community.

In the Standard Dictionary "play" is defined: ·

"A dramatic composition for scenic representation by speaking or acting, as a tragedy, comedy, farce, melodrama, or pantomime; as, Shakespeare's plays."

"Entertainment":

"A source or means of amusement; a diverting performance; especially a public performance, as a concert, drama, or the like."

"Theater":

"A building especially adapted to dramatic, operatic, or spectacular representations; a playhouse."

In Clifford v. Brandon, 2 Campb. 368, the court said:

"Theaters are not absolute necessaries of life, and any person may stay away who does not approve of the manner in which they are managed."

In Re Oriental Society (D. C.) 104 Fed. 975, a petition was filed asking for adjudication in bankruptcy against the Oriental Society, and a receiver was appointed. The creditors moved to vacate the petition and to set aside the appointment of the receiver, on the ground that the society was "a corporation incorporated for the purpose of giving theatrical performances, and is engaged solely in said business." The court said:

"Is it a 'corporation engaged principally in manufacturing, trading, printing, publishing, or mercantile pursuits?' It seems to me that to ask this question is to answer it. A corporation engaged in giving theatrical performances is, of course, not engaged in manufacturing, printing, or publishing. In my opinion also it is clearly not trading or following mercantile pursuits in the ordinary meaning of these words."

In Re Duff (D. C.) 4 Fed. 519, the court said (page 521):

"The bankrupt was a theatrical manager. It did not appear that he had any other business. * * * I think he cannot be considered a merchant or tradesman within the meaning of the statute."

In Re Surety Guarantee & Trust Co., 121 Fed. 73, 56 C. C. A. 654, it was held that a corporation buying or selling stock was not a trader.

In Queen Ins. Co. v. State, 86 Tex. 250, 24 S. W. 397, 22 L. R. A. 483, it was held that:

"A combination of insurance companies to establish uniform rates of insurance and of agents' commissions is not illegal under the Texas anti-trust law of March 30, 1889, prohibiting trusts for restrictions in trade or the production, price or rates of transportation for commodities or articles of commerce, since a contract of insurance is not 'trade,' nor is it an 'article of commerce' or a 'commodity.'"

In Paul v. Virginia, 75 U. S. 168, 183, 19 L. Ed. 357, the court said:

"Issuing a policy of insurance is not a transaction of commerce. The policies are simple contracts of indemnity against loss by fire, entered into between the corporations and the assured, for a consideration paid by the latter. These contracts are not articles of commerce in any proper meaning of the word. They are not subjects of trade and barter offered in the market as something having an existence and value independent of the parties to them. They are not commodities to be shipped or forwarded from one state to another, and then put up for sale. They are like other personal contracts between parties which are completed by their signature, and the transfer of the consideration."

In Hooper v. California, 155 U. S. 648, 655, 15 Sup. Ct. 207, 210, 39 L. Ed. 297, the court said:

"The business of insurance is not commerce. The contract of insurance is not an instrumentality of commerce. The making of such a contract is a mere incident of commercial intercourse, and in this respect there is no difference whatever between insurance against fire and insurance against 'the perils of the sea.'"

In New York Life Ins. Co. v. Cravens, 178 U. S. 389, 20 Sup. Ct. 962, 44 L. Ed. 1116, it was held that:

"The business of insurance is not commerce, and the making of a contract of insurance is a mere incident of commercial intercourse in which there is no difference whatever between insurance against fire, insurance against the perils of the sea, or insurance of life."

If theaters are not absolute necessaries of life (In re Clifford v. Brandon, supra), if a theatrical business is not trade or commerce (In re

Oriental Society, supra), if a theatrical manager cannot be considered a tradesman (In re Duff, supra), if a corporation buying or selling stock is not a trader (In re Surety Guarantee & Trust Co., supra), if the business of insurance is not trade or commerce (In re Paul v. Virginia, supra; Hooper v. California, supra; New York Life Ins. Co. v. Cravens, supra), then how can it be successfully urged that plays and entertainments of the stage are articles and commodities of common use?

In the light of the lexicographer's definition of "trade," "commerce," "play," "entertainment" and "theater," and of the foregoing decisions, it seems to me that plays and entertainments of the stage are not articles or useful commodities of common use, and that the business of owning, leasing, and controlling theaters, and producing plays therein, is not trade, and that, therefore, the defendants did not commit acts injurious to trade or commerce. The object of the conspiracy statute (subdivision 6 of section 168 of the Penal Code), is to punish those who conspire to do acts injurious to trade or commerce. The antitrust act (Laws 1899, p. 1514, c. 690, § 1) was designed to declare illegal any contract, agreement, arrangement, or combination whereby competition in the supply or price of any article or commodity of common use may be restrained or prevented, inasmuch as such contracts are against public policy, and therefore illegal and void. The subject-matter of a criminal conspiracy need not relate to an article of prime necessity; but it may also relate to a useful article or a useful commodity of a nature needful for many purposes. With reference to articles of prime necessity, such as meat (Judd v. Harrington, 139 N. Y. 105, 34 N. E. 790), milk (People v. Milk Exchange, 145 N. Y. 267, 39 N. E. 1062, 27 L. R. A. 437, 45 Am. St. Rep. 609), lard (Leonard v. Poole, 114 N. Y. 371, 21 N. E. 707, 4 L. R. A. 728, 11 Am. St. Rep. 667), sugar (People v. N. R. Sugar Refining Co., 7 N. Y. Supp. 406, 54 Hun, 354, 5 L. R. A. 386), coal (People v. Sheldon, 139 N. Y. 251, 34 N. E. 785, 23 L. R. A. 221, 36 Am. St. Rep. 690; Arnot v. Pittston & Elmira Coal Co., 68 N. Y. 558, 23 Am. Rep. 190; Drake v. Siebold, 81 Hun, 178, 30 N. Y. Supp. 697), useful articles such as tobacco (People v. Duke, 19 Misc. Rep. 292, 44 N. Y. Supp. 336), bluestone (Cummings v. Union Blue Stone Co., 164 N. Y. 401, 58 N. E. 525, 52 L. R. A. 262, 79 Am. St. Rep. 655), envelopes (Cohen v. Berlin & Jones Envelope Co., 166 N. Y. 292, 59 N. E. 906), carbon (Pittsburg Carbon Co. v. McMillin, 119 N. Y. 46, 23 N. E. 530, 7 L. R. A. 46), harrows (National Harrow Co. v. Bement & Sons, 21 App. Div. 290, 47 N. Y. Supp. 462), wirecloth (Dewitt Wire Cloth Co. v. New Jersey Wire Cloth Co., 16 Daly, 529, 14 N. Y. Supp. 277), watches and clocks (Dueber Watch Case Co. v. Howard Watch & Clock Co., 3 Misc. Rep. 582, 24 N. Y. Supp. 647), article or commodity of common use such as books (Strauss v. Am. Pub. Ass'n, 85 App. Div. 447, 83 N. Y. Supp. 271; Id., 177 N. Y. 473, 69 N. E. 1107, 64 L. R. A. 701, 101 Am. St. Rep. 819), the courts have held that contracts by which the parties to them combine for the purpose of creating a monopoly in restraint of trade, to prevent competition, to control and limit production, to increase prices and maintain them, are contrary to sound public policy and void.

The learned district attorney cites the cases of Hooker v. Vandewater, 4 Denio (N. Y.) 349, 47 Am. Dec. 258, and Stanton v. Allen, 5 Denio (N. Y.) 434, 49 Am. Dec. 282, as analogous to the case to be determined. I do not agree with this view. In Hooker v. Vandewater, supra, the proprietors of five lines of boats, engaged in the business of transporting persons and freight on the Erie and Oswego canals, entered into an agreement to run, for the remainder of the season of navigation, at certain rates for freight and passage, but which were to be changed whenever the parties should deem it expedient, and to divide the net earnings among themselves, according to certain proportions fixed in said articles. At page 353 of 4 Denio (N. Y.) the court said:

"It was a conspiracy between the individuals contracting to prevent a free competition among themselves in the business of transporting merchandise, property and passengers upon the public canals. * * * That the raising of the price of freights for the transportation of merchandise or passengers upon our canals is a matter of public concern, and in which the public have a deep interest, and does not admit of doubt."

The case of Stanton v. Allen, supra, was determined upon the principles enunciated in Hooker v. Vandewater, supra. The subject-matter of the contract in both of these cases affected articles of trade, since merchandise and property are certainly articles of trade and commerce, and hence it is manifest that these authorities were based on the principle that the parties were engaged in the business of trade and commerce.

After an exhaustive examination of the subject of what is trade and commerce, I have failed to find any decision, nor has my attention been directed to any decision, classifying theatrical amusements as articles of "trade" and "commerce." Since I have come to the conclusion that the evidence fails to show that any crime has been committed by the defendants under the indictment, it is unnecessary to determine the other questions raised by the defendants.

The motion to dismiss the indictment, as against the defendants Klaw & Erlanger, is therefore granted.

Motion granted.